Filed 5/1/15; pub. order 5/8/15 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| DAVID BERGSTEIN et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>STROOCK & STROOCK & LAVAN LLP et al.,<br><br>    Defendants and Respondents. | B244896<br><br>(Los Angeles County<br>Super. Ct. No. BC483164) |

APPEAL from orders of the Superior Court for the County of Los Angeles. Michael Linfield, Judge. Affirmed.

Horvitz & Levy, Frederic D. Cohen, Felix Shafir, Jeremy B. Rosen; Weingarten Brown, Alex M. Weingarten and Eric J. Bakewell for Plaintiffs and Appellants.

Munger, Tolles & Olson, Brad D. Brian, Michael R. Doyen, Lisa J. Demsky and Manuel F. Cachan for Defendants and Respondents Stroock & Stroock & Lavan LLP and Daniel Rozansky.

Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup; Parker Shumaker Mills and David B. Parker for Defendants and Respondents Levene, Neale, Bender, Yoo & Brill L.L.P., David Neale, Irving Gross and Beth Young.

———————————————————

## SUMMARY

The plaintiffs in this case (David Bergstein and affiliated business entities) sued the lawyers who represented their adversaries (David Molner and others) in litigation over various financial transactions. Plaintiffs asserted that the lawyers engaged in illegal conduct when they "solicited and received . . . confidential, privileged, and/or proprietary information" from plaintiffs' former attorney, and used that information "in devising the legal strategy to be employed" in the litigation against plaintiffs.

The defendant lawyers filed a special motion to strike the complaint under Code of Civil Procedure section 425.16, the anti-SLAPP (strategic lawsuit against public participation) statute. The trial court granted the motion and awarded attorney fees to defendants. The court concluded the complaint arose from protected First Amendment activity; there was insufficient evidence to show defendants' conduct was illegal as a matter of law; and plaintiffs did not show a probability of prevailing on their claims, both because the statute of limitations had run and because the litigation privilege barred plaintiffs' claims.

We affirm the trial court's orders.

## FACTS

### 1. The Background

Plaintiffs are involved in acquiring, producing and distributing motion pictures, as well as in commercial transactions in other business sectors. Their activities require the involvement of entities or individuals willing to provide financing. David Molner and entities he controlled (Aramid Entertainment Fund Limited and others (Aramid)) participated in a number of financial transactions relating to plaintiffs' film production and distribution business, making a series of loans to plaintiffs from 2007 to 2009.

In 2009, the business relationship between plaintiffs and Aramid became "highly adversarial." Molner and Aramid hired defendants – Stroock and Stroock and Lavan LLP and its partner, Daniel Rozansky, and Levene Neale Bender Yoo & Brill L.L.P. and its partners, David Neale, Irving Gross, and Beth Young – to represent them in litigation against plaintiffs. (Plaintiffs describe this as "Molner's and Aramid's war" and a " 'fight

2

to the death' litigation struggle [that] spawned numerous lawsuits" in California, New York, and elsewhere.)  The Levene Neale firm was "to craft and institute involuntary bankruptcy proceedings against Plaintiffs and affiliated entities," and the Stroock firm was "to construct and implement a litigation strategy against Plaintiffs and affiliated entities that involved filing a series of lawsuits at or about the same time as the involuntary bankruptcy proceedings were initiated."

Attorney Susan Tregub was plaintiff Bergstein's lawyer for over a decade, and she represented the other plaintiff entities as well.  She was intimately familiar with and had access to plaintiffs' confidential, privileged and proprietary information, including core operating and financial documents, electronic records and other records, and was the custodian of critical documents related to plaintiffs.  She effectively served as plaintiffs' general counsel, maintaining an office in the same suite with some of the plaintiff companies, and was paid a monthly retainer.

In late 2009, Ms. Tregub and plaintiff Bergstein had a falling out over fees, and Ms. Tregub "threatened [Mr. Bergstein] that 'she would bring [him] down.' "

On March 16, 2010, Aramid, represented by the Stroock firm, sued plaintiff Bergstein for breach of personal guarantees given to secure loans from Aramid, and at about the same time, the Levene Neale firm, on behalf of creditors including Aramid, filed involuntary bankruptcy petitions against affiliated entities of plaintiffs.

Ms. Tregub, despite her previous (and to some extent continuing) representation of plaintiffs, began working for Aramid and David Molner in November or December 2009. She "coordinated and organized" the filing of the involuntary bankruptcy proceedings, and she assisted Aramid in the litigation against plaintiffs "arising out of loan transactions in which she had been directly involved even though Aramid's interests were clearly directly adverse" to plaintiffs' interests.

On March 25, 2010, Mr. Bergstein and other plaintiffs sued Ms. Tregub for breach of fiduciary duty and professional negligence, ultimately (in August 2012) obtaining a multimillion dollar verdict and punitive damages.

3

## 2. The Complaint

On April 20, 2012, two years or so after filing suit against Ms. Tregub, plaintiffs filed this lawsuit against defendants, alleging causes of action for aiding and abetting Ms. Tregub's breach of fiduciary duty; interference with contractual relations and prospective economic advantage; and unjust enrichment. In addition to the facts we have just recited and other colorful but irrelevant matters, the complaint alleged, by way of introduction, that:

"In the course of their representation [of Aramid]," defendants "knowingly used the confidential, privileged, and/or proprietary information of Plaintiffs and affiliated entities to carry out a litigation attack" on plaintiffs. Defendants "solicited and received this confidential, privileged, and/or proprietary information from Susan Tregub, Plaintiffs' former attorney." Ms. Tregub "admittedly concealed material evidence at Defendants' direction."

"During the period prior to the filing of legal proceedings against [plaintiffs], Defendants received a steady flow of confidential, privileged, and/or proprietary information [from] Tregub to assist them in their efforts. They exchanged drafts of pleadings with her, emailed back and forth about various issues, and participated in telephone conference calls and in person meetings while Tregub was present. . . . Defendants knowingly received from Tregub confidential, privileged, and/or proprietary information about Bergstein, his business dealings, and the various entities through which he conducted business. Defendants knowingly used Tregub's assistance in devising the legal strategy to be employed against Bergstein . . . . They used Tregub to obtain documents, identify witnesses, and solicit potential creditors. . . ."

"Defendants' actions have caused Plaintiffs to be involved in lengthy, protracted, contentious, and expensive legal proceedings. . . . [T]he litigations, litigation fees and costs, resources devoted to the litigations, and negative publicity accompanying the litigations have resulted in nearly incalculable injury and damage to Plaintiffs' business interests. . . ."

4

The substantive allegations of the complaint appear in paragraphs 45 through 145 of the complaint. Part I allegations (¶¶ 45-53) describe the background giving rise to the underlying litigation (described *ante*). Part II and Part III allegations (¶¶ 54-110) describe, respectively, defendants' preparation for "a litigation war" against plaintiffs (¶¶ 54-71) and defendants' improper use of plaintiffs' confidential information, in preparation for the litigation and after it was filed (¶¶ 72-110). Part IV allegations describe plaintiffs' lawsuit against Ms. Tregub for professional negligence and breach of fiduciary duty and defendants' resistance to discovery demands in that lawsuit (¶¶ 111-120). Part V allegations allege defendants' knowledge of Ms. Tregub's representation of plaintiffs (¶¶ 121-127), and Part VI allegations describe plaintiffs' damages (¶¶ 128-145).

We begin with a sampling of the substantive allegations of the complaint. Plaintiffs allege:

"Aramid and Defendants began working with Tregub to initiate legal proceedings against Plaintiffs beginning in November or December 2009." This involved two projects, a "master complaint" against Mr. Bergstein and several affiliated entities and the involuntary bankruptcy petitions. Both projects involved defendants' "knowing solicitation, receipt, and use" of plaintiffs' confidential, privileged, and/or proprietary information.

"Prior to December 2009, Stroock and Rozansky began drafting the Master Complaint." Ms. Tregub revised the draft, and "[b]y working on and assisting with the preparation of the Master Complaint, Tregub provided confidential . . . information about Plaintiffs to Stroock and Rozansky," who "took and used this confidential . . . information without Plaintiff's consent . . . ."

"During the preparation of the Master Complaint, Stroock and Rozansky . . . invited Tregub to attend strategy sessions," at which they "strategized about ways to put maximum pressure on Plaintiffs including by the litigation contemplated in the Master Complaint and parallel bankruptcy proceedings."

Stroock and Rozansky used the master complaint containing plaintiffs' confidential information "as the basis for the complaints they intended to file"; solicited

advice and support from the Levene Neale defendants "regarding the planned litigation for Aramid"; and "[u]ltimately, Stroock and Rozansky, on behalf of Aramid and working in conjunction with Tregub, filed multiple lawsuits in federal and state court against certain Plaintiffs."

"As Stroock and Rozansky knew, the factual information supporting the claims that were asserted . . . were derived from the Master Complaint that Tregub . . . and Defendants drafted . . . ."

"In addition, Defendants participated in preparing papers in [another action] seeking a temporary restraining order," and "Rozansky sought and received from Tregub information regarding the relationships between Bergstein [and others]," as well as "documents . . . that Tregub obtained while she represented Plaintiffs."

Ms. Tregub also "worked hand-in-hand" with defendants Levene Neale and its partners "to prepare petitions, motions, and other papers necessary to force the entities affiliated with Bergstein into involuntary bankruptcy." The complaint then describes the consultations and communications between Ms. Tregub and the Levene Neale firm, and alleges the firm's solicitation and use of the information Ms. Tregub provided, including preparation of a master strategy memorandum, identification of entities to be placed in bankruptcy, and communications on that subject. In addition, the Levene Neale firm "orchestrated the improper purchase of a claim against entities affiliated with Plaintiffs," for use in the involuntary bankruptcy proceedings, by working with Ms. Tregub and using confidential information she provided; the complaint gives examples of communications on this topic.

A Levene Neale partner worked with and directed Ms. Tregub in contacting former employees of plaintiff-affiliated entities to prepare declarations in support of an emergency order appointing a trustee. Levene Neale filed the bankruptcy petitions and motion; communicated with Ms. Tregub on strategy; and so on. The complaint describes other efforts by the Stroock firm, involving involuntary bankruptcy proceedings in other jurisdictions, to acquire claims against another company to which Mr. Bergstein had lent

6

millions of dollars, and to "scour[] the globe to locate other potential creditors" of that company.

The complaint also alleges that after months of participating in communications involving Ms. Tregub, defendants attempted to hide their conduct by forwarding emails to and from Ms. Tregub through an intermediary, using a "pivot and pass" strategy, with Ms. Tregub proving information to Aramid, and Aramid forwarding the information to defendants.

Defendants "continued to assist Tregub in breaching her duties even after [the various lawsuits] were filed."

The complaint then describes the lawsuit plaintiffs filed against Ms. Tregub on March 25, 2010, for professional negligence and breach of fiduciary duty (the Tregub case); their requests for discovery from Ms. Tregub and subpoenas for documents from defendants; and defendants' "repeated refusals . . . to abide by their discovery obligations in the Tregub Case . . . ." The complaint alleges that when defendants began working with Ms. Tregub, they were aware Ms. Tregub represented plaintiffs in the past and "continued to represent Plaintiffs and affiliated entities in ongoing litigation."

The complaint describes plaintiffs' "nearly insurmountable damage and injury to their business operations since the filing" of the bankruptcy proceedings and the loan litigation, and alleges their "value and businesses are diminished by" and Bergstein lost "the benefit of his Miramax deal because of" the ongoing litigation.

### 3.     The Anti-SLAPP Motion

Defendants filed special motions to strike the complaint under the anti-SLAPP statute. Their motions alleged plaintiffs' claims were based on defendants' conduct in filing litigation; filing litigation is protected activity under the anti-SLAPP statute; and plaintiffs could not prevail on their claims because the claims were barred both by the statute of limitations and by the litigation privilege.

Plaintiffs' opposition contended their claims did not arise from protected activity. They asserted that the complaint alleged defendants participated in the theft of confidential and privileged documents and information, and in the unlawful purchase of

7

claims for the purpose of forcing an involuntary bankruptcy, and that this was nonlitigation conduct not protected under the anti-SLAPP statute, "separate and distinct from [defendants'] ultimate filing of any litigation." Plaintiffs asserted their claims "are based on the 'other conduct' [rather than statements made in connection with litigation] and their relation to litigation is 'merely incidental.' " The gravamen of their complaint, they contended, was "Tregub's blatant disregard of her duty of loyalty to her clients and theft of privileged and confidential information – and, of course, Defendant's participation in those unlawful acts."

Plaintiffs' opposition included more than 2,000 pages of documents, including dozens of email communications among Ms. Tregub, Mr. Molner and various defendants, and asserted that defendants' conduct was not protected by the anti-SLAPP statute because the conduct was illegal as a matter of law. On this last point, the entirety of plaintiffs' argument was this: "Here, Defendants engaged in conduct that they knew was illegal. They used Tregub's inside information to buy bankruptcy claims despite knowing that to do so was unlawful. *See, e.g.,* 11 U.S.C. app. § 1003 [Federal Rules of Bankruptcy Procedure, rule 1003] (improper to purchase claims to force involuntary bankruptcy). They offer no defense to their active participation in illegal activities, and the anti-SLAPP statute offers no protection for Defendants' participation in illegal activities." In any event, plaintiffs contended, they showed a likelihood of prevailing on the statute of limitations and litigation privilege defenses asserted by defendants.

The trial court, in a thorough 39-page decision, granted the special motion to strike, and later awarded defendants $150,222.64 in attorney fees. Plaintiffs appealed from both orders.

## DISCUSSION

A defendant may bring a special motion to strike any cause of action "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (Code Civ. Proc., § 425.16, subd. (b)(1).) When ruling on an anti-SLAPP motion, the trial court employs a two-step process. It first looks to see whether the

8

moving party has made a threshold showing that the challenged causes of action arise from protected activity. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 (*Equilon*).) If the moving party meets this threshold requirement, the burden then shifts to the other party to demonstrate a probability of prevailing on its claims. (*Ibid.*) In making these determinations, the trial court considers "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) Our review is de novo. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3 (*Soukup*).)

In this case, plaintiffs first contend that, as a threshold matter, the anti-SLAPP statute does not apply because defendants engaged in unlawful acts that are not protected by the anti-SLAPP statute. They further contend that "[c]laims arising from aiding and abetting breach of fiduciary duties" are not subject to the anti-SLAPP statute, "even if they occur in the context of litigation." They contend their claims are not barred by the statute of limitations or the litigation privilege, and they should have been permitted to amend their complaint to "rais[e] non-protected claims."

We find no merit in any of plaintiffs' contentions, and address them in turn.

1.    **The First Prong of the Statute:  Protected Activity**

The moving party has the initial burden of making a prima facie showing that one or more causes of action arise from protected activity. (*Equilon, supra,* 29 Cal.4th at p. 67; see Code Civ. Proc., § 425.16, subd. (e).)

Statements made in litigation, or in connection with litigation, are protected by Code of Civil Procedure section 425.16, subdivision (e). (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115.) Courts have taken a fairly expansive view of what constitutes litigation-related activity for purposes of section 425.16. (See *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 908.) In making a prima facie showing, however, it is not enough to establish that the action was filed in response to or in retaliation for a party's exercise of the right to petition. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89; *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76-77.)

9

Rather, the claim must be *based on* the protected petitioning activity.  (*Navellier*, at p. 89.)

When a cause of action involves both protected and unprotected activity, the court looks to the gravamen of the claim to determine if the claim is a SLAPP.  (*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 672-673 (*Peregrine Funding*).)  Protected conduct which is merely incidental to the claim does not fall within the ambit of Code of Civil Procedure section 425.16.  (*Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 188; *Peregrine Funding*, *supra*, at p. 672.)  Determining the gravamen of the claims requires examination of the specific acts of alleged wrongdoing and not just the form of the claim.  (*Peregrine Funding*, *supra*, at p. 671.)

### a. The illegality claim

Plaintiffs first argue that the anti-SLAPP statute does not apply because defendants' conduct was illegal as a matter of law, relying on *Flatley v. Mauro* (2006) 39 Cal.4th 299 (*Flatley*).

In *Flatley*, the court held that "a defendant whose assertedly protected speech or petitioning activity was illegal as a matter of law, and therefore unprotected by constitutional guarantees of free speech and petition, cannot use the anti-SLAPP statute to strike the plaintiff's complaint."  (*Flatley*, *supra*, 39 Cal.4th at p. 305.)  The court stated the rule this way:  where "either the defendant concedes, or the evidence conclusively establishes, that the assertedly protected speech or petition activity was illegal as a matter of law, the defendant is precluded from using the anti-SLAPP statute to strike the plaintiff's action."  (*Id.* at p. 320.)  In *Flatley*, an attorney's communications to the plaintiff (a demand letter and subsequent telephone calls) "constituted criminal extortion as a matter of law" and so were unprotected.  (*Id.* at pp. 305, 332.)  The evidence of the defendant's communications was uncontroverted.  (*Id.* at p. 329.)  The court emphasized that its conclusion that the defendant's communications constituted criminal extortion as a matter of law was "based on the specific and extreme circumstances of this case."  (*Id.* at p. 332, fn. 16.)

10

Plaintiffs contend that "conclusive evidence that a violation of any state statute has occurred is sufficient to trigger application of the illegality exception and bar a defendant from seeking the protection of the anti-SLAPP law." Here, they say, their evidence conclusively established that defendants aided and abetted Ms. Tregub's violation of Business and Professions Code section 6068, subdivision (e)(1).[1] (Section 6068 provides

---

[1] The "conclusive evidence" of illegality defendants cite on appeal consists of email correspondence to and from Ms. Tregub. The cited emails are substantially as follows: Ms. Tregub's emails to defendant David Neale and others revealing that Bergstein "planned on reneging" on a certain loan transaction; that Bergstein planned to dispose of certain personal property in various warehouses (and that one Bergstein entity "has no real creditors and is not insolvent"), and that the lawyers should not use a particular press quotation of Bergstein's because he could show he was misquoted, and she would "work on digging [Bergstein's emails] up this weekend"; a Levene Neale inquiry as to whether Ms. Tregub ever found any checks evidencing payment of personal debts with company funds; Ms. Tregub's request to Sanjay Sharma (a defendant later dismissed from the appeal in this case) to forward to the Levene Neale firm a document "outlining the relationships and history of the company," setting forth "some of the allegations regarding how all these companies are intermingled," and saying that one entity had "profoundly disorganized or non-existent books and records" and a "nearly impossible time raising capital"; emails between Ms. Tregub and defendant Rozansky in which Ms. Tregub provided information about a lawsuit Warner Brothers had just filed, apparently against Mr. Bergstein and one of his entities, and suggested Mr. Rozansky call her if he wanted additional information, which Rozansky said he would do; in the same email, Ms. Tregub says she is "off to court for an ex parte appearance to get out of a DB case," and "[i]f the judge doesn't grant my motion, I may be making a collect call to you [Rozansky]"; Ms. Tregub's email to Levene Neale lawyers forwarding a copy of a complaint in a case against Bergstein that Ms. Tregub had been handling for Bergstein (and telling them "to be careful with bandying my name about – this is what set David [Bergstein] off last time threatening me"); an email from Ms. Tregub to Levene Neale lawyers forwarding a 2008 Bergstein email, and saying she was "going through this" with a person who could "point to specific instances of either bogus allocations or inappropriate accounting practices . . ."; an email to defendant Neale with "the documentation that shows Capitol trying to book productions fees on some films that were non-existent"; an email from Ms. Tregub to Levene Neale lawyers attaching documents such as organizational and financial statements for Bergstein-affiliated entities; email correspondence among Ms. Tregub and the Levene Neale firm and others identifying creditors willing to file claims in the bankruptcy proceedings and providing background information; email correspondence among Levene Neale lawyers, Ms. Tregub and others about declarations from various persons; email correspondence

11

that it is the duty of an attorney "[t]o maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client.")**2**

We reject plaintiffs' contention for two reasons. First, case authorities after *Flatley* have found the *Flatley* rule applies only to criminal conduct, not to conduct that is illegal because in violation of statute or common law. And second, even if we accept the contention that the illegality exception may in some circumstances apply to statutory violations that are not criminal conduct, we could not apply the illegality exception in this case. As we explain *post*, plaintiffs' opposition papers in the trial court failed even to cite the statutory violation on which they now rely – and that omission is fatal under the Supreme Court authority plaintiffs cite to support their contention.

### i.    The post-*Flatley* cases

In *Mendoza v. ADP Screening and Selection Services, Inc.* (2010) 182 Cal.App.4th 1644 (*Mendoza*), a panel of this court expressly rejected the plaintiff's contention "that

---

showing Ms. Tregub provided comments on bankruptcy filings and asking the comments be forwarded to Levene Neale; an email from Ms. Tregub to David Molner, asking him to forward a copy of a lawsuit to Levene Neale, and Molner's response saying he had done so, but "[p]robably easier to use Sanjay to pivot and pass," because "[i]t may otherwise get stalled in my in-box"; Ms. Tregub's deposition testimony that by the time of the "pivot and pass" comment, "we had determined at this point that it was better for me not to communicate directly with David Neale's office"; an email message from Ms. Tregub to Mr. Molner saying "I think for BK stuff you should CC me and then forward to Dan"; emails showing Ms. Tregub worked on declarations for the bankruptcy litigation in coordination with Levene Neale; emails and red-lined drafts showing Ms. Tregub worked on the "master complaint" for the Aramid loan litigation (comments on the drafts show, for example that "Susan will insert particulars of emails from David [Bergstein] regarding pay-off of LR and $5 loans, not sending out default notices and discussions and promises re global resolution," and another comment on allegations about a loan commitment says, "Susan do we need to explain this?"

**2**    Plaintiffs also cite rules 3-100(A) and 1-120 of the Rules of Professional Conduct, which say, respectively, that a member of the Bar "shall not reveal information protected from disclosure by Business and Professions Code section 6068, subdivision (e)(1) without the informed consent of the client," and "shall not knowingly assist in, solicit, or induce any violation of these rules . . . ."

12

every violation of a statutory prohibition necessarily removes the violator out from under the protective umbrella of the anti-SLAPP statute." (*Id.* at p. 1653.) *Mendoza* explained:

"Our reading of *Flatley* leads us to conclude that the Supreme Court's use of the phrase 'illegal' was intended to mean criminal, and not merely violative of a statute. First, the court in *Flatley* discussed the attorney's underlying conduct in the context of the Penal Code's criminalization of extortion. Second, a reading of *Flatley* to push any statutory violation outside the reach of the anti-SLAPP statute would greatly weaken the constitutional interests which the statute is designed to protect. As [the defendant] correctly observes, a plaintiff's complaint *always* alleges a defendant engaged in illegal conduct in that it violated some common law standard of conduct or statutory prohibition, giving rise to liability, and we decline to give plaintiffs a tool for avoiding the application of the anti-SLAPP statute merely by showing any statutory violation." (*Mendoza, supra,* 182 Cal.App.4th at p. 1654, *id.* at p. 1648 [the defendant's republishing to its clients of information disclosed on "Megan's Law" web site was protected activity, notwithstanding statutory prohibitions on the use of such information].)

Other courts have taken the same view, and *Fremont Reorganizing Corp. v. Faigin* (2011) 198 Cal.App.4th 1153 (*Fremont*) is particularly germane. In that case, the plaintiff argued that statements by the defendant lawyer to the Insurance Commissioner violated his duties of confidentiality and loyalty owed to the plaintiff as a former client, so his conduct was illegal and could not be protected activity under the *Flatley* rule. The court, in an opinion by Justice Croskey, disagreed, citing several Court of Appeal opinions, including *Mendoza*, that "have rejected attempts to apply the rule from *Flatley* . . . to noncriminal conduct." *Fremont* held, "[c]onsistent with these authorities," that "the rule from *Flatley* . . . is limited to criminal conduct. Conduct in violation of an attorney's duties of confidentiality and loyalty to a former client cannot be 'illegal as a matter of law' . . . within the meaning of *Flatley*, so the anti-SLAPP statute is not inapplicable on this basis." (*Id.* at p. 1169.)

For similar conclusions, see *Price v. Operating Engineers Local Union No. 3* (2011) 195 Cal.App.4th 962, 971 (*Price*) (rejecting claim that a union's allegedly

13

defamatory statements in flyers were not covered under the anti-SLAPP statute because defamatory speech is illegal; "[t]he term 'illegal' in *Flatley* means criminal, not merely violative of a statute"); see also *Cross v. Cooper* (2011) 197 Cal.App.4th 357, 390, 388 ("even if [the plaintiff] conclusively demonstrated that [the defendant's] disclosure [of information on the location of a registered sex offender] was unauthorized as a matter of law, under *Mendoza*, that unauthorized, but noncriminal, conduct would not preclude anti-SLAPP protection"); *Gerbosi v. Gaims, Weil, West & Epstein, LLP* (2011) 193 Cal.App.4th 435, 446 ("We understand *Flatley* to stand for this proposition: when a defendant's assertedly protected activity *may or may not be* criminal activity, the defendant may invoke the anti-SLAPP statute unless the activity is criminal as a matter of law."); *G.R. v. Intelligator* (2010) 185 Cal.App.4th 606, 616 (failure to comply with rule 1.20 of the California Rules of Court "is not the type of criminal activity addressed in . . . *Flatley*"); *Cabral v. Martins* (2009) 177 Cal.App.4th 471, 481 (the defendant attorneys' actions in probate proceedings and litigation defense "were neither inherently criminal nor otherwise outside the scope of normal, routine legal services"; even if their actions "had the effect of defeating or forestalling [the plaintiff's] ability to execute her judgment for child support, thereby (according to [the plaintiff]) violating the child support evasion statutes, this is not the kind of illegality involved in *Flatley*").

### ii.     The *Soukup* case

Plaintiffs resist the conclusion in the post-*Flatley* cases, relying on *Soukup*, *supra*, 39 Cal.4th 260, a decision filed the same day as *Flatley*.  *Soukup* involved the then-recently enacted SLAPPback statute (Code Civ. Proc., § 425.18), and the court said that an illegal act "is an act '[f]orbidden by law,' " and that the term "illegal," as used in the SLAPPback statute, was not intended to refer only to criminal violations.  (*Soukup,* at p. 283 & fn. 12.)  According to plaintiffs, the Supreme Court's discussion of illegality in *Soukup* "signaled" that the *Flatley* rule is not limited to criminal conduct and "instead extends to any unlawful activities."

The courts that subsequently decided *Fremont*, *Mendoza*, *Price* and the other pertinent authorities, however, did not get this "signal."  That is because the SLAPPback

statute is a very different law with a very different purpose, as *Soukup* itself makes clear. A "SLAPPback" is a malicious prosecution or abuse of process lawsuit that arises from the filing or maintenance of an earlier cause of action that has been dismissed as a SLAPP. The Legislature expressly stated "that a SLAPPback cause of action should be treated differently . . . from an ordinary malicious prosecution action because a SLAPPback is consistent with the Legislature's intent to protect the valid exercise of the constitutional rights of free speech and petition by its deterrent effect on SLAPP . . . litigation and by its restoration of public confidence in participatory democracy." (Code of Civ. Proc., § 425.18, subd. (a).)

As *Soukup* points out, Code of Civil Procedure section 425.18 "treats SLAPPbacks differently from ordinary malicious prosecution actions in two ways. First, it makes inapplicable to special motions to strike a SLAPPback certain procedures that would normally apply to such motions and sets forth different procedures." (*Soukup, supra,* 39 Cal.4th at pp. 281-282.) After describing these differences, the court continued: "The import of these provisions is to stack the procedural deck in favor of the SLAPPback plaintiff confronted with a special motion to strike."[3] (*Id.* at p. 282.) "The second way in which section 425.18 treats SLAPPbacks differently from ordinary malicious prosecution actions is to provide a limited exemption for SLAPPbacks from the anti-SLAPP statute in subdivision (h). That subdivision provides: 'A special motion to strike may not be filed against a SLAPPback by a party whose filing or maintenance of the prior cause of action from which the SLAPPback arises was illegal as a matter of law' (§ 425.18, subd. (h).)" (*Ibid.*)

---

[3] "They do so by providing the plaintiff with both a longer timeframe—and the means with which—to conduct discovery that might yield evidence to resist the motion to strike, exempting the plaintiff from fees and costs even if the plaintiff's SLAPPback action is stricken and minimizing the delays and expense the plaintiff might otherwise incur while the case is on appeal by limiting the unsuccessful defendant to writ review." (*Soukup, supra,* 39 Cal.4th at p. 282.)

15

It was in this context that the *Soukup* court observed that the term "illegal as a matter of law" included statutory violations that were not criminal (in *Soukup*, a Labor Code violation was at issue). Not only was the context different – SLAPPback suits rather than SLAPP suits – but also the court was careful to specify the narrowness of its holding: "[I]f a defendant's assertedly protected constitutional activity is alleged to have been illegal and, therefore, outside the ambit of the anti-SLAPP statute, the illegality must be established as a matter of law either through the defendant's concession or because the illegality is conclusively established by the evidence presented in connection with the motion to strike." (*Soukup*, *supra,* 39 Cal.4th at p. 285.) Thus *Soukup* cited *Paul for Council v. Hanyecz* (2001) 85 Cal.App.4th 1356 (*Paul*), disapproved on other grounds in *Equilon*, *supra*, 29 Cal.4th at page 68, footnote 5, where the defendants' own "moving papers . . . show[ed] that they in fact did violate the Political Reform Act when they laundered campaign contributions . . . ."[4] (*Paul*, *supra*, at p. 1361; *Soukup*, at p. 284.)

Further, *Soukup* tells us that, in SLAPPback cases, the "burden of establishing that the underlying action was illegal as a matter of law" is the plaintiff's burden. (*Soukup, supra,* 39 Cal.4th at p. 286.) And, in demonstrating the illegality, "the plaintiff must identify with particularity the statute or statutes violated by the filing and maintenance of the underlying action. [Citation.] This requirement of identifying a specific statute . . . prevents a plaintiff from advancing a generalized claim that a defendant's conduct was illegal" and "provides notice to both the defendant and the court about the particular statute or statutes the defendant is alleged to have violated as a matter of law so as to allow the defendant to intelligibly respond to, and the court to assess, the claim. Additionally, . . . the plaintiff must show the specific manner in which the statute or

---

[4] As *Soukup* explains, *Paul* held that because the " 'defendants have effectively conceded the illegal nature of their election campaign finance activities for which they claim constitutional protection . . . as a matter of law . . . such activities [were] *not* a valid exercise of constitutional rights as contemplated by section 425.16.' " (*Soukup, supra,* 39 Cal.4th at p. 284.)

16

statutes were violated with reference to their elements. A generalized assertion that a particular statute was violated by the filing or maintenance of the underlying action without a particularized showing of the violation will be insufficient to demonstrate illegality as a matter of law." (*Soukup, supra,* 39 Cal.4th at p. 287.)

Plaintiffs' opposition to the special motion to strike did not comply with *Soukup*'s requirement that plaintiffs "provide[] notice to both the defendant and the court" as to the particular statute they asserted defendants violated, "so as to allow the defendant to intelligibly respond to, and the court to assess, the claim."[5] (*Soukup, supra,* 39 Cal.4th at p. 287.) Plaintiffs' papers opposing the special motion to strike did not mention Business and Professions Code section 6068; plaintiffs' first and only mention of section 6068 occurred in counsel's rebuttal argument at the hearing on the motion, when counsel said that "section 6068 actually expressly holds or provides . . . that violation of attorney-client privilege is a tort," and defendants "aided and abetted the violation . . . so they are vicariously liable for that tort." As we noted in our recitation of the facts, *ante* at page 8, plaintiffs' opposition papers claimed only that defendants "used Tregub's inside information to buy bankruptcy claims despite knowing that to do so was unlawful" – a claim they do not assert on appeal.

We think it fair to assume that had plaintiffs provided the notice required by *Soukup* in their opposition papers, defendants may have disputed one or another element of the claim, such as whether they "acted with the intent of facilitating the commission" of Ms. Tregub's violation of the statute. (See *Gerard v. Ross* (1988) 204 Cal.App.3d 968, 983 [articulating the knowledge required for aiding and abetting liability; "[a] defendant can be held liable as a cotortfeasor on the basis of acting in concert only if he

---

**5**     In plaintiffs' complaint, the only mention of Business and Professions Code section 6068 appears in paragraph 158 (alleging interference with contractual relations), where plaintiffs describe Ms. Tregub's oral agreements with plaintiffs as containing an implied-by-law obligation in Ms. Tregub to maintain plaintiffs' confidences, a duty "firmly entrenched in case law and codified in Section 6068 of the California Business and Professions Code . . . ."

or she knew that a tort had been, or was to be, committed, and acted with the intent of facilitating the commission of that tort"].)  And certainly if defendants had disputed any element of the claim they aided and abetted a violation of Business and Professions Code section 6068, no conclusion could be drawn, as a matter of law, that their conduct was illegal.  (*Flatley, supra,* 39 Cal.4th at p. 316 ["If . . . a factual dispute exists about the legitimacy of the defendant's conduct, it cannot be resolved within the first step but must be raised by the plaintiff in connection with the plaintiff's burden to show a probability of prevailing on the merits."]; *Birkner v. Lam* (2007) 156 Cal.App.4th 275, 285 [" '[C]onduct that would otherwise come within the scope of the anti-SLAPP statute does not lose its coverage . . . simply because it is *alleged* to have been unlawful or unethical.' "].)

In short, *Soukup* does not help plaintiffs here.  Its definition of illegality applied to the SLAPPback statute.  And even if *Soukup*'s broader definition of "illegal[ity] as a matter of law" were appropriate for application in the first prong of a SLAPP analysis, it would be improper to apply it here, where plaintiffs failed to give the "notice to both the defendant and the court" of the particular statutory violation, as expressly required by *Soukup*.  (*Soukup, supra,* 39 Cal.4th at p. 287.)

In sum, *Soukup* does not advance plaintiffs' claim of illegality, and the authorities after *Flatley* reject it.

### b.      The gravamen of the complaint

Plaintiffs next argue that, apart from the illegality claim, their claims do not arise from protected activity.  They articulate their contention this way:  "Even though the background of this lawsuit is the litigation between Molner and Bergstein, the defendants here are not being sued because they are Molner's litigation counsel or for any written or oral statement they made in a judicial proceeding.  Rather, they are being sued for the unprotected conduct of aiding and abetting the breach of Tregub's fiduciary duties to [plaintiffs], for receiving confidential and privileged information belonging to [plaintiffs], for interfering with Tregub's contractual obligation to [plaintiffs] to maintain their confidences, and for interfering with [Bergstein's] prospective economic advantage."

18

Plaintiffs' own words reveal their mistaken view of the applicable legal principles. "The anti-SLAPP statute's definitional focus is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning." (*Navellier v. Sletten*, *supra,* 29 Cal.4th at p. 92.) Thus we examine "the specific acts of wrongdoing" alleged, "without particular heed to the form of action within which it has been framed" (*Peregrine Funding, supra*, 133 Cal.App.4th at p. 671), and "the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech. [Citations.]" (*City of Cotati v. Cashman*, *supra,* 29 Cal.4th at p. 78.)

Plainly, "aiding and abetting the breach of Tregub's fiduciary duties" and "interfering with Tregub's contractual obligation to [plaintiffs] to maintain their confidences" are the causes of action plaintiffs assert, not the "specific acts of alleged wrongdoing" that give rise to those causes of action. Almost all of the "specific acts of alleged wrongdoing" in the complaint are litigation activities. We have described the complaint in detail and will not repeat that description here, but the factual basis for defendants' allegedly tortious activity is centered in defendants' role as counsel for Mr. Molner and Aramid: "Molner enlisted defendants for the litigation prong of his campaign." "Defendants knowingly used . . . confidential, privileged . . . information . . . to carry out the litigation attack . . . ." "Tregub began working with defendants to help coordinate and organize" the bankruptcy proceedings. "Defendants knowingly used Tregub's assistance in devising the legal strategy to be employed . . . ." Defendants "exchanged drafts of pleadings" with Ms. Tregub. "Stroock and Rozansky work[ed] with Tregub to draft multiple lawsuits against plaintiffs." "The litigation, litigation fees and costs, . . . and negative publicity . . . have resulted in nearly incalculable injury . . . ." And on and on.

Plaintiffs rely on *Coretronic Corp. v. Cozen O'Connor* (2011) 192 Cal.App.4th 1381 (*Coretronic*), but their reliance is misplaced. In *Coretronic*, the plaintiffs disclosed confidential information to the defendant law firm to aid in an evaluation of insurance

19

coverage for a trade dispute lawsuit filed against the plaintiffs, and the defendant law firm at the same time undertook representation, in another matter, of the company (E&S) that was suing the plaintiffs. The plaintiffs sued the law firm, alleging it concealed its status as E&S's counsel in the other action to gain access to the plaintiffs' sensitive information that would benefit E&S in its lawsuit against the plaintiffs. (*Id.* at pp. 1384-1385, 1387.) We concluded that the gravamen of the complaint was "premised on defendants' failure to disclose [their] representation of E&S, while obtaining from plaintiffs their confidential information involving their defense of the lawsuit E&S brought against them." (*Id.* at p. 1391.) While the concealment occurred in the context of litigation, it was "clear that any litigation activity is only incidental to plaintiffs' allegations of wrongdoing." (*Ibid.*)

In short, in *Coretronic*, the lawsuit arose from the law firm's concealment of its representation of E&S while obtaining plaintiff's sensitive information, not from the law firm's protected activity representing their clients in pending or threatened litigation. (*Coretronic, supra,* 192 Cal.App.4th at p. 1392.) As we said there, "it is not [the law firm's] advocacy that is the target of the complaint," but rather the fact of the law firm's dual representation that was the basis for the plaintiffs' claims of concealment and fraud. (*Id.* at p. 1392.) In this case, by contrast, it is precisely the defendants' advocacy on behalf of their clients in the loan and bankruptcy litigation that forms the basis for all of plaintiffs' causes of action.

*Peregrine Funding* explains the point nicely: "Plaintiffs . . . argue the fundamental basis or gravamen of their claims rests in [the defendant law firm's] breaches of duty and not its petitioning activity. But the fact is that some of the alleged *actions* constituting these breaches of duty involved petitioning activity the firm undertook on behalf of its client . . . . [S]ome of the specific conduct complained of involves positions the firm took in court, or in anticipation of litigation . . . . We cannot conclude these allegations of classic petitioning activity are merely incidental or collateral to plaintiff's claims against [the law firm]." (*Peregrine Funding, supra,* 133 Cal.App.4th at p. 673; *id.* at p. 672 [law firm "orchestrated the bankruptcies of the

20

entity-plaintiffs and then, after it withdrew from their representation, selectively responded to a discovery request by withholding documents that would have been harmful to . . . themselves"; these acts "appear to constitute [protected conduct] in that they were litigation tactics the firm employed to benefit its client[']s position in an ongoing lawsuit"].)

Plaintiffs cite other cases where the plaintiffs have sued their former counsel for breach of the duty of loyalty, and courts have found those claims are not subject to the anti-SLAPP statute. But in those cases, as in *Coretronic*, the plaintiffs "do not challenge [the defendant law firm's] conduct in the litigation" (*Coretronic, supra,* 192 Cal.App.4th at pp. 1392-1393), but instead base their claims on the defendant attorney's acceptance of representation adverse to the former client. (E.g., *Benasra v. Mitchell Silberberg & Knupp LLP* (2004) 123 Cal.App.4th 1179, 1189, 1187 ["once the attorney accepts a representation in which confidences disclosed by a former client may benefit the new client due to the relationship between the new matter and the old, he or she has breached a duty of loyalty"; "[t]he breach of fiduciary duty lawsuit may follow litigation pursued against the former client, but does not arise from it"; breach of the duty of loyalty "occurs whether or not confidences are actually revealed in the adverse action"].)

Here, unlike any of the breach of loyalty cases, the "activity that gives rise to [defendants'] asserted liability" (*Navellier v. Sletten*, *supra*, 29 Cal.4th at p. 92) is defendants' conduct in receiving and using confidential information to prepare for and prosecute litigation against plaintiffs. In the complaint's own words, defendants "knowingly used the confidential, privileged, and/or proprietary information of Plaintiffs and affiliated entities to carry out a litigation attack on Plaintiffs and affiliated entities." Defendants' litigation activities are at the core of plaintiffs' claims. Clearly those claims arise from protected activity within the meaning of the anti-SLAPP statute.

## 2.    The Second Prong of the Statute:  the Probability of Prevailing

Plaintiffs next contend they have in any event shown a probability of prevailing on their claims. They point out that under this second prong of the anti-SLAPP statute, they need only present evidence that, if believed, would be sufficient to establish a prima facie

21

case and sustain a judgment in their favor. (*Navellier v. Sletten, supra,* 29 Cal.4th at pp. 88-89.) Defendants assert, however, that plaintiffs cannot prevail because their claims are barred as a matter of law, both by the litigation privilege and by the statute of limitations. We agree with both points.[6]

### a. The litigation privilege

"A plaintiff cannot establish a probability of prevailing if the litigation privilege precludes the defendant's liability on the claim." (*Fremont, supra,* 198 Cal.App.4th at p. 1172.) The litigation privilege is defined in Civil Code section 47, subdivision (b)[7] (section 47(b)), and "precludes liability arising from a publication or broadcast made in a judicial proceeding or other official proceeding." (*Fremont*, at p. 1172.) Under the usual formulation of the privilege, it applies "to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212.) "Many cases have explained that section 47(b) encompasses not only testimony in court and statements made in pleadings, but also statements made prior to the filing of a lawsuit, whether in preparation for anticipated litigation or to investigate the feasibility of filing a lawsuit." (*Hagberg v. California Federal Bank FSB* (2004) 32 Cal.4th 350, 361.)

To effect its purposes – access to the courts without fear of later harassment by derivative tort actions, encouraging open communication and zealous advocacy,

---

[6]     The Levene Neale defendants also assert that plaintiffs failed to show a probability of prevailing on their claims against them on several additional bases, including that the claims are barred by collateral estoppel and preempted by federal law. Because our decision on other grounds is dispositive, we need not consider these contentions.

[7]     "A privileged publication or broadcast is one made: . . . [¶] . . . [¶] (b) In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure [(writ of mandate)]," with exceptions not applicable here. (Civ. Code, § 47, subd. (b).)

promoting complete and truthful testimony, giving finality to judgments, and avoiding endless litigation – the litigation privilege "is absolute and applies regardless of malice," and " 'has been given broad application.' " (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1063.)

In a two-and-a-half page argument, plaintiffs contend their claims are not barred by the litigation privilege "because the complaint does not challenge defendants' communicative acts," but rather challenges "the lawyers' non-communicative conduct of aiding and abetting Tregub's breach of fiduciary duty and facilitating Tregub's breach of contract with [plaintiffs]." This contention contains the same flaw infecting plaintiffs' assertion that their claims do not arise from protected activity: the complaint itself plainly demonstrates otherwise. Notably, nowhere in plaintiffs' argument do they provide record citations for defendants' "non-communicative conduct."

Plaintiffs tell us that two cases are "instructive." One is *Kimmel v. Goland* (1990) 51 Cal.3d 202 (*Kimmel*) and the other is *Susan S. v. Israels* (1997) 55 Cal.App.4th 1290 (*Israels*). In *Kimmel*, the Supreme Court held that "noncommunicative acts" -- specifically, "the illegal recording of confidential telephone conversations" for "the purpose of gathering evidence to be used in future litigation" -- were not privileged. (*Kimmel,* at p. 205.) As the court said, the litigation privilege "does not bar recovery for injuries from tortious *conduct* regardless of the purpose for which such conduct is undertaken." (*Ibid.*) Similarly, in *Israels*, the court held that the litigation privilege "does not shield defendants [including the lawyer representing the defendant in a criminal proceeding for sexual battery] from liability for reading and disseminating [the plaintiff's] private mental health records for the purpose of gathering evidence to be used in the course of a criminal proceeding." (*Israels,* at p. 1301.) *Israels* held the plaintiff's invasion of privacy action did not depend on "the 'publication or 'broadcast' of her mental health records but rests on [the defendant's] conduct in reading those records" – conduct that was "similar to the defendants' conduct of . . . secretly recording telephone conversations" in *Kimmel.* (*Israels,* at p. 1299.) (Notably, *Israels* also held that the plaintiff's abuse of process and infliction of emotional distress claims, based on

23

"subpoenaing, communicating and cross-examining [the plaintiff] with her mental health records," *were* barred by the litigation privilege. (*Id.* at pp. 1303-1304.))

Neither of these cases assists the plaintiffs here, because they do not identify *any* of defendants' conduct that was *not* a communication made in a judicial proceeding (or prior thereto) to achieve the objects of the litigation. Simply claiming that "aiding and abetting Tregub's breach of fiduciary duty and facilitating Tregub's breach of contract" is "non-communicative conduct" does not make it so.

In short, defendants have established all the elements necessary to assert the litigation privilege. As the trial court pointed out, plaintiffs' claims are based on allegations that defendants solicited and used confidential information for the purpose of filing various actions against plaintiffs. The complaint expressly alleges communicative activity throughout. These communicative activities of counsel were made in or in anticipation of judicial proceedings, and were plainly made "to achieve the objects of the litigation" and had "some connection or logical relation to the action." (*Silberg v. Anderson, supra,* 50 Cal.3d at p. 212.) Consequently, the litigation privilege applies to bar plaintiffs' claims.

Plaintiffs add a final paragraph to their argument on this point, quoting from *Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1149, where the court held that the litigation privilege should not be extended to " 'litigating in the press.' " (See *id.* at p. 1139 [defendants' statements at a press conference claiming plaintiff knowingly and intentionally made false accusations against one of defendants in order to extort money from him were not protected by the litigation privilege].) From this (correct) premise, plaintiffs state, without further explanation, that "the intentional interference claims based upon defendants' false press statements are likewise not covered by the litigation privilege."

While plaintiffs do not cite to the record in their argument, we presume they are referring to an allegation in the introductory section of the complaint, where they allege that "Stroock partner and well known entertainment transactional [lawyer] Schuyler Moore even bragged to the press that his clients, Aramid and Molner, and his firm would

24

stop at nothing to kill Bergstein's other business ventures – specifically his efforts to arrange for the purchase and sale of Miramax from Disney." (In their opposition, defendants presented an email from a Bloomberg News reporter to a lawyer involved in the Miramax acquisition, saying that "Schuyler Moore will be quoted saying that creditors of Mr. Bergstein's companies would block any attempt to acquire the film studio [Miramax].")

With that exception, there is nothing in the complaint about any statements by any of the defendants to the press, much less any false statements. Nor is it clear that the statement in the reporter's email is tortious. The complaint alleges there were many negative articles in the press, written by a reporter who spoke with Mr. Molner and Ms. Tregub, that damaged Mr. Bergstein, and that "Tregub communicated with reporters and shared Plaintiffs' and affiliated entities' confidential, privileged, and/or proprietary information long before any litigation was filed." But these are not allegations relating to defendants. In short, under *Rothman v. Jackson*, the litigation privilege would not shield defendants from liability based on making false statements to the press, but the complaint makes no such allegations.

### b. The statute of limitations

Defendants also contend plaintiffs cannot prevail on their claims because they are barred as a matter of law by the statute of limitations. We agree.

Under Code of Civil Procedure section 340.6 (section 340.6), "[a]n action against an attorney for a wrongful act or omission, other than for actual fraud, arising in the performance of professional services shall be commenced within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the facts constituting the wrongful act or omission, or four years from the date of the wrongful act or omission, whichever occurs first." (*Id.*, subd. (a).)

In this case, plaintiffs filed suit on April 20, 2012. But:

On March 25, 2010, more than two years earlier, plaintiff Bergstein and others filed their complaint against Ms. Tregub for breach of fiduciary duty and professional

negligence, alleging that Ms. Tregub "provided confidential information to Aramid's counsel . . . Strook Strook [*sic*] & Lavan LLP . . . ."  And:

On March 24, 2010, plaintiff Bergstein executed a declaration stating that, after he learned of the litigation Aramid filed against him and of the involuntary bankruptcy filings by the Levene Neale firm, he "immediately suspected that Tregub might be behind both the Aramid and the bankruptcy filings."  And:

On March 26, 2010, plaintiff Bergstein's lawyers wrote to Mr. Rozansky and another lawyer at the Stroock firm about the bankruptcy proceedings and the Aramid complaint, and said, among other things:  "We have received information that Susan Tregub . . . has been assisting you and your law firm as well as certain alleged creditors . . . in connection with those proceedings and in connection with the Aramid Complaint. It further appears that Ms. Tregub has disclosed to you and your law firm . . . confidential information of [plaintiffs] that Ms. Tregub obtained while representing them . . . ."  And, "the [plaintiffs] intend to pursue any and all legal remedies they have that arise out of the use of any and all confidential information and assistance provided by Ms. Tregub . . . . Please be aware that we consider any communications between your firm and Ms. Tregub to be evidence that will have to be produced in any resulting litigation that will hereafter follow to determine the extent to which your firm was complicit in Ms. Tregub's breach of her fiduciary obligations . . . ."  And:

On April 2, 2010, after receiving a letter from Stroock lawyer Rozansky saying the Stroock lawyers had not received confidential information from Ms. Tregub, plaintiffs' lawyers again wrote to the Stroock lawyers.  They said, for example:  "[F]or at least the past several months attorneys in your firm have been communicating with Ms. Tregub, including receiving information from Ms. Tregub pertaining to some or all of the Plaintiffs and their various legal and business affairs."  Those communications constituted "improper dissemination of confidential information" and violated attorney-client privilege, and "your firm's involvement in these actionable activities will not be tolerated.  Moreover, your firm may be exposed to independent tort liability and ethics violations for receipt and/or use of such wrongfully obtained information from

26

Ms. Tregub and Plaintiffs reserve all rights related to your conduct." The letter demanded immediate return of all documents in any form between the firm and Ms. Tregub pertaining to plaintiffs or their business dealings, and demanded the Stroock firm cease and desist from engaging in such communications with Ms. Tregub. Also:

On September 24, 2010, counsel for one of the plaintiff-affiliated alleged debtors in the involuntary bankruptcy proceedings filed a motion to disqualify the Levene Neale firm on the ground that the firm "knowingly utilized confidential privileged information of Alleged Debtors obtained by the Levene firm from their co-counsel Susan Tregub," and "knowingly assisted and aided Tregub in the violation of her duties of loyalty and confidentiality to the Alleged Debtors."

On October 26, 2010, in a cross-complaint against Stroock's client Aramid, plaintiffs alleged that Aramid aided and abetted Tregub to breach her fiduciary duty by "inviting Tregub to attend strategy sessions with counsel for the Aramid Defendants, which Tregub did attend and participate in, to strategize about ways to put maximum pressure on Bergstein, including litigation to be filed against [Bergstein and others] and involuntary bankruptcy proceedings to be filed against [affiliated entities] . . . ."

The documents just described show that, by their own admission, plaintiffs "discover[ed], or through the use of reasonable diligence should have discovered, the facts constituting [defendants'] wrongful act or omission" (Code of Civ. Proc., § 340.6, subd. (a)) more than one year before they filed this lawsuit. The rule on when the statute of limitations begins to run is plain: "Under the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her. . . . [T]he limitations period begins once the plaintiff ' " 'has notice or information of circumstances to put a reasonable person *on inquiry* . . . .' " ' [Citation.] A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to

27

find her." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110-1111 (*Jolly*), fn. omitted.)

Plaintiffs counter by contending section 340.6 does not apply, and instead the four-year statute of limitations in Code of Civil Procedure section 343 – the limitations period for "[a]n action for relief not hereinbefore provided for" – applies. This is because, they say, they are not suing defendants for "a wrongful act or omission . . . arising in the performance of professional services," but rather for the "independently tortious conduct" of aiding and abetting Tregub's breach of fiduciary duty, interfering with Ms. Tregub's contract with Mr. Bergstein, and so on. We have heard, and rejected, this contention before, and it fares no better in the context of the statute of limitations.

It is not correct, as a matter of fact and of law, to say that "Bergstein's aiding and abetting claims do not arise from the defendants' performance of their professional services . . . ." Plaintiffs' complaint shows they do as a matter of fact: as we have seen, virtually all of defendants' allegedly tortious conduct occurred in the performance of legal services for their clients. As for the law, "[w]hen determining which statute of limitations applies to a particular action, a court considers what the principal purpose or 'gravamen' of the action is, rather than the form of action or the relief demanded." (*Yee v. Cheung* (2013) 220 Cal.App.4th 184, 194.)

Further, we reject defendants' contention that section 340.6 "only applies when an attorney is sued for professional negligence." The court in *Stoll v. Superior Court* (1992) 9 Cal.App.4th 1362 held that a former client's claim against his former lawyer for breach of fiduciary duty is governed by section 340.6. (*Id.* at pp. 1363-1364, 1369.) And, while there is a split of authority, two courts, including this court, have held that section 340.6 is not confined to malpractice actions by a plaintiff against his own attorney, but also applies to malicious prosecution claims by a third party against an attorney. (*Vafi v. McCloskey* (2011) 193 Cal.App.4th 874, 880 (*Vafi*) ["the one-year limitations period under section 340.6 applies to an action for malicious prosecution against an attorney rather than the two-year limitations period which applies to malicious prosecution actions generally"]; accord, *Yee v. Cheung, supra,* 220 Cal.App.4th at pp. 194, 195 ["The words

28

of the statute are quite broad, but they are not ambiguous:  any time a plaintiff brings an action against an attorney and alleges that attorney engaged in a wrongful act or omission, other than fraud, in the attorney's performance of his or her legal services, that action must be commenced within a year after the plaintiff discovers, or should have discovered, the facts that comprise the wrongful act or omission."]; contra, *Roger Cleveland Golf Co., Inc. v. Krane & Smith, APC* (2014) 225 Cal.App.4th 660, 668 [disagreeing with *Vafi* and *Yee* and holding that the applicable statute of limitations for malicious prosecution is Code of Civil Procedure section 335.1, whether the party being sued is the former adversary or the adversary's attorneys].)

We are not persuaded to change our view that, based on its plain language, section 340.6 applies to *all* actions "against an attorney for a wrongful act or omission, other than for actual fraud, arising in the performance of professional services . . . ." (*Id.*, subd. (a); *Vafi, supra,* 193 Cal.App.4th at p. 881.)

Plaintiffs next insist they have produced prima facie evidence showing their claims are timely under the discovery rule.  They say they did not learn "the facts constituting [defendants'] wrongful act or omission" (section 340.6) until April 26, 2011, when, according to declarations from Mr. Bergstein and his counsel, "[t]he very first documents showing the communications between Tregub and [defendants] were . . . produced in the Tregub case" and "[u]ntil that time, Defendants . . . denied that they had received confidential information from Tregub and engaged in scorched earth litigation . . . to prevent us from obtaining this evidence."

While we accept these assertions as true, they do not affect the accrual of the statute of limitations.  That is perfectly plain from *Jolly*:  "A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery"; so long as a "suspicion of wrongdoing" exists, "it is clear that the plaintiff must go find the facts . . . ." (*Jolly, supra,* 44 Cal.3d at p. 1111.)  Plaintiffs do not and cannot say they had no suspicion of wrongdoing by defendants until April 26, 2011; their own statements show otherwise.  Further, their claims that "the discovery rule must prevent the statute of limitations from running until [they] had sufficient evidence to

29

support their prima facie case" is likewise unsupported by any pertinent legal authority, and is affirmatively contradicted by *Jolly*.

Finally, plaintiffs contend defendants are equitably estopped from raising the statute of limitations as a defense, "because of their active efforts to keep plaintiffs from uncovering the truth of their activities," and they have "satisfied the requirements for fraudulent concealment." These assertions are based upon the defendants' "repeated[] deni[al]" of receiving confidential information and their resistance to discovery in the Tregub case. These claims are meritless.

Among other things, equitable estoppel requires a showing defendants' conduct "actually and reasonably induced plaintiffs to forbear suing" within the limitations period. (*Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 385, italics omitted.) Thus, when a defendant's conduct has deliberately induced the plaintiff to delay filing suit, the defendant will be estopped from availing himself of this delay as a defense. This is obviously not such a case. As the trial court aptly observed, "denials of wrongdoing are not the same as fraudulent concealment," and "it would be somewhat surprising" if defendants "were to issue a mea culpa and beg forgiveness" when they received counsel's demand letters. Plainly, as shown by plaintiffs' April 2, 2010 letter responding to Stroock's denial it received confidential information, plaintiffs did not believe these denials, and cannot rely on them now to create an estoppel. Moreover, as *Lantzy* pointed out, a defendant's statement or conduct inducing delay in filing suit "must amount to a misrepresentation bearing on the *necessity* of bringing a timely suit; the defendant's mere denial of *legal liability* does not set up an estoppel." (*Id.* at p. 384, fn. 18, citing cases.)

Nor has there been any showing of fraudulent concealment. Indeed, plaintiffs merely claim they "satisfied the requirements for fraudulent concealment" without troubling to state those requirements and how they were met or to cite relevant authorities. Of course, "[i]t has long been established that the defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations, but only for that period during which the claim is undiscovered by plaintiff or until such time as plaintiff, by the exercise of reasonable diligence, should have discovered it." (*Sanchez*

30

*v. South Hoover Hospital* (1976) 18 Cal.3d 93, 99-100.) As already discussed, it is clear that plaintiffs had already discovered their claims in March and April 2010, when they told defendants that their communications with Ms. Tregub and involvement in "these actionable activities" would not be tolerated. No fraudulent concealment has been or could be shown in these circumstances.

In sum, section 340.6 means exactly what it says: an action against an attorney for a wrongful act (except actual fraud) arising in the performance of professional services must be commenced within one year of discovery of the facts constituting the wrongful act. Nothing occurred in this case to toll the statute or estop defendants from raising it as a defense. Because plaintiffs did not file their lawsuit within the one-year limitations period, they cannot show a probability of prevailing on the merits of their claims.

**3.      Amendment of the Complaint**

Plaintiffs contend that "false statements made to the press about Bergstein are not protected conduct," and they have therefore stated a viable claim for tortious interference with prospective economic advantage, "even if there are other allegations in the same cause of action that are properly subject to an anti-SLAPP motion," citing *Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1212 ("where a cause of action arises from both protected activity and unprotected activity, the plaintiff may satisfy its obligation in the second prong by simply showing a probability of prevailing on any part of the cause of action"). They also claim they should have leave to amend the complaint to raise "non-protected claims, including defendants' false statements to the press," citing *Nguyen-Lam v. Cao* (2009) 171 Cal.App.4th 858, 871-873 (trial court properly authorized plaintiff to amend her defamation complaint to plead actual malice, in conformity with the proof presented at the hearing on the anti-SLAPP motion; policy concerns against amendment in the anti-SLAPP context did not apply in that circumstance).

Plaintiffs' contentions have no merit. First, as we have already pointed out, the complaint did not allege defendants made false statements to the press, and plaintiffs produced no evidence constituting a prima facie showing of such statements. Second, this is not a case like *Nguyen-Lam v. Cao*, where the proof presented at the hearing

31

actually established a probability of prevailing on the merits, so the general rule against allowing a SLAPP plaintiff to amend a complaint after a showing of protected activity did not apply. And third, even now plaintiffs in their appellate briefs do not demonstrate how they would amend the complaint to allege defendants made false statements to the press, or how they would allege any other "non-protected claims." There was no error in the trial court's refusal to permit amendment.

**4.      Attorney Fees**

Plaintiffs appealed the attorney fee order, but argue only that the award should be reversed if the order granting the anti-SLAPP motions is reversed. Because we affirm the trial court's grant of the anti-SLAPP motions, we also affirm the attorney fee order.

**DISPOSITION**

The orders are affirmed. Defendants shall recover their costs on appeal.


GRIMES, J.

We concur:

BIGELOW, P. J.



FLIER, J.

Filed 5/8/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| DAVID BERGSTEIN et al.,<br><br>　　Plaintiffs and Appellants,<br><br>　　v.<br><br>STROOCK & STROOCK & LAVAN LLP et al.,<br><br>　　Defendants and Respondents. | B244896<br><br>(Los Angeles County<br>Super. Ct. No. BC483164)<br><br>**ORDER CERTIFYING OPINION FOR PUBLICATION**<br><br>**[NO CHANGE IN JUDGMENT]** |

THE COURT:

　　The opinion in the above-entitled matter filed on May 1, 2015, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

　　There is no change in the judgment.

_____

BIGELOW, P. J.　　　　　　　　FLIER, J.　　　　　　　　GRIMES, J.

33