Filed 4/18/16  The James C. Earle and Laurie D. Korman Trust v. Dialameh CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE JAMES C. EARLE AND LAURIE D. KORMAN TRUST et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> ORANG DIALAMEH et al., <br><br> Defendants and Respondents. <br><br>———————————————— <br><br> ORANG DIALAMEH et al., <br><br> Cross-Complainants and Respondents, <br><br> v. <br><br> LAURIE D. KORMAN et al., <br><br> Cross-Defendants and Appellants. | B259107 <br><br> (Los Angeles County <br> Super. Ct. No. SC120475) |

APPEAL from an order of the Superior Court of Los Angeles County, Craig D. Karlan, Judge. Reversed with directions.

Pettit Kohn Ingrassia & Lutz, Grant D. Waterkotte and Jeffrey K. Miyamoto for Plaintiffs, Cross-Defendants and Appellants James C. Earle and Laurie D. Korman Trust, James C. Earle, and Laurie D. Korman.

Tabatabai & Blonstein, Farzad Tabatabai and Robert S. Blonstein for Cross-Defendant and Appellant Djamschid Baghestani.

Schonbrun DeSimone Seplow Harris & Hoffman and V. James DeSimone; Law Offices of Robert P. Baker and Robert P. Baker for Defendants, Cross-Complainants and Respondents.

————————————

This appeal is from an order denying special motions to strike a cross-complaint pursuant to the anti-SLAPP statute, Code of Civil Procedure section 425.16.[1]

We reverse. Each of the three causes of action alleged by respondents in the cross-complaint—breach of fiduciary duty, intentional interference with contract, and elder abuse—arises, in significant part, from protected petitioning activity, including a variety of legal actions between appellants and respondents. Further, respondents have not shown a probability of prevailing on any of their causes of action. Accordingly, we reverse the order denying the special motions to strike, and remand the matter to the trial court with directions to dismiss the cross-complaint and award attorney fees to appellants.

---

[1] All subsequent undesignated statutory references are to the Code of Civil Procedure.

2

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### The Parties

All of the individual parties to this action are neighbors. James (Jim) C. Earle and Laurie D. Korman (collectively, the Earles) are husband and wife who own property located at 821-823 20th Street in Santa Monica.[2] The Earles' property includes a two-story house and courtyard, three single-bedroom apartments, and four single-car garages. The Earles live in the two-story house and rent the three single-bedroom apartments.

Orang Dialameh and Azita Moallef (collectively, the Dialamehs) are husband and wife who own property located at 827 20th Street in Santa Monica. The Dialamehs' property includes a one-story house, an office, three single-bedroom apartments (Units A, B, and C), and three single-car garages. The Earles' property and the Dialamehs' property are adjacent to one another and share a common walkway. The Dialamehs lived in the one-story house on their property until approximately December 2011, when they moved to a new home in Topanga Canyon.

Fari Moallef is Azita's mother, and Afsaneh Akbari is Azita's sister. Fari and Afsaneh lived in Unit A of the Dialamehs' property.

Djamschid Baghestani was a tenant of the Dialamehs and lived in Unit B of the Dialamehs' property.

### II.

### The Earles' Nuisance Complaint

The Earles filed the present action against the Dialamehs on March 29, 2013.[3] The operative complaint alleges that Afsaneh lived on the Dialamehs' property at various times during the preceding 15 years. When Afsaneh lived on the property, the Earles

---

[2] Because some of the parties share last names, for clarity we refer to them by their first names.

[3] The plaintiffs to this action are The James C. Earle and Laurie D. Korman Trust (the trust), and Laurie D. Korman and James C. Earle, as individuals and as trustees for the trust.

frequently heard her screaming at Fari and playing loud music.  After the Dialamehs moved away, Afsaneh's behavior worsened.  The Earles and their tenants and neighbors "often heard [Afsaneh] screaming at [Fari] and heard things being thrown and banging from [Fari's] apartment on [the Dialamehs'] Property.  On several nights, [the Earles] and [the Earles'] tenants were woken up by [Afsaneh] pacing the Common Walkway yelling or talking loudly to herself.  Several times, the police were called."

Afsaneh "began to harass and intimidate [the Earles] in approximately May of 2012.  Subsequently, [Afsaneh] would walk back and forth along the Common Walkway, look into windows of a unit on [the Earle's] property, growling and screaming profanities at [the Earles], threatening [the Earles], and kicking in the front gate to [the Earles'] residence.  Additionally, [Afsaneh] attempted to break into [the Earles'] garage, stalked [the Earles], and videotaped [the Earles'] car and license plate."  The Dialamehs permitted Afsaneh to continue to live on their property, knowing that she would continue to cause physical harm to the Earles and their property.  Further, the Dialamehs conducted a business out of their illegally converted garage, used the middle garage on their property as a rental unit, and rented their one-story house to short-term renters.

The complaint alleged four causes of action against the Dialamehs:  (1) private nuisance, (2) public nuisance, (3) trespass, and (4) negligence.  It sought damages, an injunction against Afsaneh's continued residence on the property and the Dialamehs' continuing violations of city and state codes, and attorney fees and costs.

### III.

### The Dialamehs' Cross-Complaint

The Dialamehs and Fari filed a cross-complaint against the Earles and Baghestani on November 12, 2013.  The operative first amended cross-complaint (hereinafter, cross-complaint), filed January 29, 2014, alleges as follows.

The Earles are attorneys and represented the Dialamehs in a variety of matters, but later sued them in connection with those same matters.  Further, the Earles conspired with

4

Baghestani to prevent the "Ellis Act conversion"[4] of the Dialamehs' property and force its sale to the Earles. Specifically, the Earles are alleged to have done the following:

(a) Provided legal representation to the Dialamehs, including by advising them how to evict Fari and Afsaneh from the Dialamehs' property.

(b) Provided legal representation to Afsaneh in connection with an injunctive relief proceeding against Baghestani, giving her "bad legal advice for the purpose of injuring Afsaneh, Fari, Orang and Azita."

(c) Counseled Baghestani to install "spy cameras" in common areas and to sue the Dialamehs for charging excess rent, advised Baghestani in settlement negotiations with Afsaneh, and obtained a declaration from Baghestani for use in the present lawsuit.

(d) Disclosed the Dialamehs' confidential attorney-client information in seeking a temporary restraining order and a preliminary injunction in this action.

(e) Filed an application for a restraining order against Afsaneh.

(f) Abused service.

(g) Locked Fari out of the common walkway.

(h) Made use of surveillance cameras "to appear whenever any family member of [the Dialamehs] arrived and confront[ed] them with hostile looks and aggressive gestures."

(i) "[S]ent demand letters for settlement, asked for damages[,] and started complaining about plants in the Common Walkway, short term rentals that ended long ago, visits of Azita's acupuncture patients 4 years ago, phantom and non-existent code violations; and then fil[ed] a lawsuit seeking injunctive relief . . . ."

Baghestani is alleged to have brought an excess rent case against the Dialamehs, "fil[ed] and pursu[ed] . . . a lawsuit and criminal complaints upon the advice of [the Earles]," sworn out "false complaints," filed "false and frivolous civil harassment actions

---

[4] The Ellis Act (Gov. Code, §§ 7060 et seq.) "allows landlords who comply with its terms to go out of the rental business by evicting their tenants and withdrawing all units from the market even if doing so would otherwise violate a local rent control ordinance." (*Marlin v. Aimco Venezia, LLC* (2007) 154 Cal.App.4th 154, 156, fn. 1.)

. . . against Afsaneh," given a declaration in the present action, sent demand letters for settlement, asked for damages, dumped detergent on Fari's garden, run a vacuum in his apartment late at night, installed "spy cameras," sexually assaulted Afsaneh, shined a flashlight in Afsaneh's eyes, and jumped out in front of the Dialamehs' children.

The actions of the Earles and Baghestani are alleged to give rise to the following causes of action:

(1)     Breach of fiduciary duty (by the Dialamehs against the Earles):  As their attorneys, the Earles owed the Dialamehs duties of loyalty and competence.  The Earles breached these duties by representing conflicting interests, including Afsaneh against the Dialamehs, the Earles against Afsaneh, the Earles against the Dialamehs, and Baghestani against the Dialamehs.  "By filing this action and suing their own clients and by representing Baghestani against Afsaneh, [the Earles] have taken positions adverse to their own clients and have represented adverse interests.  In doing so, they have breached their duties of loyalty and competence as well as their fiduciary duty."  Moreover, "[i]n the course of this litigation, [the Earles] have disclosed, in fact have raced to disclose unnecessarily, confidential attorney/client communications with their clients, [the Dialamehs]."

(2)     Interference with contract (by the Dialamehs and Fari against the Earles and Baghestani):  Fari executed a written lease for Unit A of the Dialamehs' property in approximately 2003.  Pursuant to the lease, Fari paid rent of $570 per month.  The written lease was augmented by oral terms, including that Afsaneh could live with Fari rent-free.  The Dialamehs intended to allow Fari to live in Unit A for the rest of her life.  Fari moved out only due to the harassment and wrongful conspiracy of the Earles and Baghestani.  Specifically, the Earles "fomented discord and convinced Baghestani, incorrectly, that he had been charged excess rent.  They referred him to a lawyer and gave him legal advice . . . .  Their motivation was to use Baghestani's claim as a lever to procure the eviction of Fari and Afsaneh . . . .  In order to maintain peace, . . . [the Dialamehs] settled that case for $40,000. . . .  The evidence in this case will show that Baghestani was not charged illegal rent."  Further, the Earles advised Baghestani to

6

engage in "bizarre conduct," which included confronting, assaulting, and harassing Fari and Afsaneh.

(3) Elder abuse (Fari against the Earles and Baghestani): Fari is over the age of 65. Through all the conduct alleged above, the Earles and Baghestani committed financial abuse of an elder by appropriating Fari's personal property interest in the lease of Unit A. "[B]y depriving Fari of [possession of Unit A], they obtained the benefits of having it themselves. What they wanted was Afsaneh out of the Property and that is what they obtained. Having Afsaneh in residence was one of the benefits to which Fari was entitled and Cross-Defendants obtained that benefit (the removal of Afsaneh) by compelling the removal of Fari through their wrongful conduct."

## IV.

### The Earles' and Baghestani's Special Motions to Strike

The Earles and Baghestani filed special motions to strike the cross-complaint pursuant to the anti-SLAPP statute, Code of Civil Procedure section 425.16. They asserted that the allegations of the cross-complaint arose out of protected petitioning activity—namely, calling the police, filing police reports, filing applications for restraining orders, testifying in court, sending a pre-lawsuit demand letter, and filing the present action. Further, they contended that the litigation privilege precluded the claims against them; the breach of fiduciary duty claim failed because there was no credible evidence that either Laurie or Jim ever had an attorney-client relationship with the Dialamehs or Fari; the interference with contract claim failed because Fari did not have a lease (contract) with which they interfered; and the elder abuse claim failed because neither Laurie, Jim, nor Baghestani obtained any property from Fari.

The trial court denied the special motions to strike on September 12, 2014, finding that the Earles and Baghestani had not demonstrated that the cross-complaint arose from free speech or petitioning activity. The Earles and Baghestani timely appealed from the order denying the anti-SLAPP motions.

7

## DISCUSSION

## I.

## Overview of Anti-SLAPP Statute and Standard of Review

"Section 425.16, 'commonly referred to as the anti-SLAPP statute' [citation, fn. omitted] is intended 'to provide for the early dismissal of unmeritorious claims filed to interfere with the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances' [citation].  The section authorizes the filing of a special motion that requires a court to strike claims brought 'against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue . . . unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.'  (§ 425.16, subd. (b)(1).)

"Section 425.16 ' "requires that a court engage in a two-step process when determining whether a defendant's anti-SLAPP motion should be granted." ' [Citation.] ' "First the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity.  [Citation.]  'A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause [of action] fits one of the categories spelled out in section 425.16, subdivision (e)' [citation]." [Citation.]  . . . [¶]  If the defendant makes this showing, the court proceeds to the second step of the anti-SLAPP analysis.  [Citation.]  In the second step, the court decides whether the plaintiff has demonstrated a reasonable probability of prevailing at trial on the merits of its challenged causes of action.  [Citations.] [¶]  Conversely, if the defendant does not meet its burden on the first step, the court should deny the motion and need not address the second step.  [Citation.]'

" 'An appellate court reviews an order granting an anti-SLAPP motion under a de novo standard.  [Citation.]  In other words, we employ the same two-pronged procedure as the trial court in determining whether the anti-SLAPP motion was properly [denied].'  [Citation.]"  (*Hunter v. CBS Broadcasting, Inc*. (2013) 221 Cal.App.4th 1510, 1519.)

## II.

### The First Prong:  Protected Activity

"The moving party has the initial burden of making a prima facie showing that one or more causes of action arise from protected activity.  (*Equilon* [*Enterprises v. Consumer Cause, Inc.* (2002)] 29 Cal.4th [53,] 67; see Code Civ. Proc., § 425.16, subd. (e).)"  (*Bergstein v. Stroock & Stroock & Lavan LLP* (2015) 236 Cal.App.4th 793, 803 (*Bergstein*).)  "We review the parties' pleadings, declarations, and other supporting documents at this stage of the analysis only 'to determine what conduct is actually being challenged, not to determine whether the conduct is actionable.'  [Citation.]"  (*Castleman v. Sagaser* (2013) 216 Cal.App.4th 481, 491 (*Castleman*).)

"As used in section 425.16, subdivision (e), an ' "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" includes:  (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.' "  (*DeCambre v. Rady Children's Hospital-San Diego* (2015) 235 Cal.App.4th 1, 12-14.)

The Supreme Court has explained that the statutory phrase " 'cause of action . . . arising from' means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.]  In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech.  [Citations.]"  (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 (*Cashman*).)  In other words, " '[t]he anti-SLAPP statute's definitional focus is not the form of the

9

plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.' (*Navellier v. Sletten* [(2002)] 29 Cal.4th [82,] 92.)  Thus we examine 'the specific acts of wrongdoing' alleged, 'without particular heed to the form of action within which it has been framed' (*Peregrine Funding* [(2005)] 133 Cal.App.4th [658,] 671), and 'the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech.  [Citations.]'  (*City of Cotati v. Cashman*, *supra*, 29 Cal.4th at p. 78.)"  (*Bergstein*, *supra*, 236 Cal.App.4th at p. 811.)

       A.     *Breach of Fiduciary Duty*

       Litigation activities figure prominently in the first cause of action for breach of fiduciary duty.  Among other things, the first cause of action alleges that the Earles breached the duty of loyalty "[*b*]*y filing this action and suing their own clients*," accepting a subpoena from and agreeing to testify for Baghestani in a restraining order proceeding brought by Afsaneh, "appear[ing] in court and [giving] advice [to Baghestani] in settlement negotiations" against Afsaneh, seeking a restraining order against Afsaneh, and disclosing confidential information in a declaration filed in the present action.  All of these alleged acts are litigation activities that, on their face, are protected by the anti-SLAPP statute.

       The Dialamehs contended in the trial court, and urge on appeal, that the first cause of action does not arise from protected litigation conduct because (1) although litigation conduct is "mentioned," the first cause of action is not "based on" such conduct, and (2) in any event, the essence of the first cause of action is breach of the duty of loyalty by representing adverse interests, not litigation conduct.  For the reasons that follow, we disagree with both contentions.

       1.     <u>Protected Litigation Activity Is Not "Incidental to" the Breach of Fiduciary Duty Claim</u>

       The Dialamehs urge that the breach of fiduciary duty claim is not subject to the anti-SLAPP statute because although litigation is "mentioned," "[n]owhere does the [cross-complaint] claim that the First Cause of Action is *based on* the filing of the

Complaint." (Italics added.) Instead, the Dialamehs urge, the gravamen of the cross-complaint is a "conspiracy to control/purchase/prevent the Ellis Act conversion of the Property" through conduct such as "dumping detergent on a garden; sexual assault of Afsaneh; slamming the gate on her hand injuring her; locking the gate to the common walkway," and other similar actions.

Where, as here, a cause of action alleges both protected and unprotected activity, it is subject to section 425.16 " 'unless the protected conduct is "merely incidental" to the unprotected conduct.' " [Citations.]' (*Haight Ashbury Free Clinics, Inc. v. Happening House Ventures* (2010) 184 Cal.App.4th 1539, 1550-1551.)" (*Lunada Biomedical v. Nunez* (2014) 230 Cal.App.4th 459, 473.) In other words, "a cause of action can . . . be said to arise from protected conduct if it alleges at least one *wrongful* act—conduct allegedly *breaching a duty and thereby injuring the plaintiff*—that falls within the act's definition of protected conduct." (*Old Republic Construction Program Group v. The Boccardo Law Firm, Inc*. (2014) 230 Cal.App.4th 859, 869.) " '[A] plaintiff cannot frustrate the purposes of the [anti-]SLAPP statute through a pleading tactic of combining allegations of protected and nonprotected activity under the label of one "cause of action." ' (*Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 308.)" (*Salma v. Capon* (2008) 161 Cal.App.4th 1275, 1287-1288; see also *Cho v. Chang* (2013) 219 Cal.App.4th 521, 527 ["It would make little sense if the anti-SLAPP law could be defeated by a pleading, such as the one in this case, in which several claims are combined into a single cause of action, some alleging protected activity and some not."].)

We do not agree that litigation activity is "incidental" to the cause of action for breach of fiduciary duty. As we have said, the Dialamehs alleged that the Earles "breached their duties of loyalty and competence as well as their fiduciary duty" by, among other things, "filing this action and suing their own clients," "representing Baghestani against Afsaneh," and "disclos[ing] . . . confidential attorney/client communications." These allegations are not incidental to the breach of fiduciary duty claim—they are, instead, the gravamen of that claim.

11

2.    In the Circumstances Alleged Here, an Attorney's Alleged Breach of Duties Owed to a Client Is Subject to the Anti-SLAPP Statute

The Dialamehs urge that even if litigation activity is not incidental to their breach of fiduciary duty claim, numerous cases have held that actions asserting an attorney's breach of professional and ethical duties owed a client are not subject to the anti-SLAPP statute. *Castleman*, *supra*, 216 Cal.App.4th 481 is illustrative. There, the plaintiffs alleged that their former attorneys violated the duty of loyalty by agreeing to represent a rival company whose interests were adverse to the plaintiffs'. The attorneys brought a motion to strike the complaint, urging that their representation of plaintiffs' rival was protected activity within the meaning of the anti-SLAPP statute. The court disagreed, ruling that the plaintiffs' claims were not based on the attorneys' litigation activities on behalf of plaintiffs' rival, but rather on their failure to maintain loyalty to the plaintiffs. The court explained: "The breach [of loyalty] occurs not when the attorney steps into court to represent the new client, but when he or she abandons the old client. . . . In other words, once the attorney accepts a representation in which confidences disclosed by a former client may benefit the new client due to the relationship between the new matter and the old, he or she has breached a duty of loyalty. The breach of fiduciary duty lawsuit may follow litigation pursued against the former client, but does not arise from it. Evidence that confidential information was actually used against the former client in litigation would help support damages, but is not the basis for the claim. As appellants so aptly put it, their claim is not based on 'filing a petition for arbitration on behalf of one client against another, but rather, for failing to maintain loyalty to, and the confidences of, a client.' " (*Benasra v. Mitchell Silberberg & Knupp LLP* (2004) 123 Cal.App.4th 1179; see also *Sprengel v. Zbylut* (2015) 241 Cal.App.4th 140, 151-152, and cases cited therein.)

The court reached a different result in *Bergstein*, *supra*, 236 Cal.App.4th 793. There, the plaintiffs sued lawyers who represented their adversaries in litigation over various financial transactions. Plaintiffs asserted that the lawyers engaged in tortious conduct when they " 'solicited and received . . . confidential, privileged, and/or

12

proprietary information' " from one of plaintiffs' former attorneys and "used that information 'in devising the legal strategy to be employed' in the litigation against plaintiffs." (*Id.* at p. 797.) The attorneys filed a special motion to strike under the anti-SLAPP statute, and the trial court granted the motion, concluding that the complaint arose from protected activity. (*Id.* at p. 797.)

Plaintiffs appealed, contending that the attorneys were not being sued for written or oral statements made in a judicial proceeding, but rather for the unprotected conduct of aiding and abetting the former attorney's breach of fiduciary duties. (*Bergstein*, *supra*, 236 Cal.App. 4th at p. 811.) The Court of Appeal disagreed and affirmed. It explained that the anti-SLAPP statute's definitional focus " 'is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.' [Citation.]" (*Id.* at p. 811.) Thus, the court examines " 'the specific acts of wrongdoing' alleged, 'without particular heed to the form of action within which it has been framed.' " (*Ibid.*) In the case before it, "[a]lmost all of the 'specific acts of alleged wrongdoing' in the complaint are litigation activities. . . . [T]he factual basis for defendants' allegedly tortious activity is centered in defendants' role as counsel for [plaintiffs' adversaries]: . . . 'Defendants knowingly used . . . confidential, privileged . . . information . . . to carry out the litigation attack . . . .' '[Plaintiffs' former attorney] began working with defendants to help coordinate and organize' the bankruptcy proceedings. 'Defendants knowingly used [plaintiffs' former attorney's] assistance in devising the legal strategy to be employed . . . .' Defendants 'exchanged drafts of pleadings' with [plaintiffs' former attorney] . . . . And on and on." (*Ibid.*)

The court noted, moreover, that the case before it was distinguishable from other breach of duty cases brought against former attorneys: "[I]n those cases, . . . the plaintiffs 'do not challenge [the defendant law firm's] conduct in the litigation' [citation], but instead base their claims on the defendant attorney's acceptance of representation adverse to the former client. . . . [¶] Here, unlike any of the breach of loyalty cases, the 'activity that gives rise to [defendants'] asserted liability' (*Navellier v. Sletten*, *supra*, 29 Cal.4th at

13

p. 92) is defendants' conduct in receiving and using confidential information to prepare for and prosecute litigation against plaintiffs. In the complaint's own words, defendants 'knowingly used the confidential, privileged, and/or proprietary information of Plaintiffs and affiliated entities to carry out a litigation attack on Plaintiffs and affiliated entities.' *Defendants' litigation activities are at the core of plaintiffs' claims*. Clearly those claims arise from protected activity within the meaning of the anti-SLAPP statute." (*Bergstein*, *supra*, 236 Cal.App.4th at p. 813, italics added.)

The present case is analogous to *Bergstein* and distinguishable from *Castleman*. As we have said, here, as in *Bergstein*, although the cause of action alleged is breach of a duty to a former client, the specific *acts* alleged to give rise to liability are, in significant part, pursuing the present and related litigation. Further, unlike in *Castleman*, the Earles never "accept[ed] a representation" adverse to the Dialamehs—they instead filed a lawsuit on their own behalf. Because the Earles' litigation activities are at the core of the Dialamehs' breach of fiduciary duty claim, that claim arises from protected activity within the meaning of the anti-SLAPP statute.

B.     *Intentional Interference with Contract and Elder Abuse*

The second and third causes of action allege that the Earles and Baghestani interfered with Fari's contractual right to live in Unit A by harassing Fari and Afsaneh and "foment[ing] discord" among members of the Dialameh family to such an extent that Fari "abandoned her rent controlled Unit A." Such discord is alleged to have existed in significant part, as a result of Baghestani's excess rent suit against the Dialamehs: "[The Earles] fomented discord and convinced Baghestani, incorrectly, that he had been charged excess rent. They referred him to a lawyer and gave him legal advice when it was a breach of duty to do so since they represented [the Dialamehs]. Their motivation was to use Baghestani's claim as a lever to procure the eviction of Fari and Afsaneh, the interference with and forfeiture of their personal contract and property rights and control or ownership of the Property. In order to maintain peace, so that Orang could concentrate on business, and because Baghestani had been a long-time business associate, Orang settled that case for $40,000. Being involved in a long-term rent dispute with Baghestani,

14

Orang believed, would be expensive and not productive. Orang hoped that the settlement of Baghestani's case would satisfy all parties and lead to peace at the Property. Such was not to be the case. The evidence in this case will show that Baghestani was not charged illegal rent. However, that lawsuit never would have been brought by Baghestani but for the breach of fiduciary duty by [the Earles]. Their motivations were to stir up antagonism between Baghestani, Fari, Afsaneh[,] other tenants[,] and [the Dialamehs] for their own financial benefit and to gain control of the Property . . . ."

The Dialamehs also alleged that the Earles sought to "interfere with the rights of Fari and Afsaneh" to live in Unit A by "[giving] Afsaneh bad legal advice," "accept[ing] a subpoena from and agree[ing] to testify for Baghestani," "appear[ing] in court and [giving] advice in settlement negotiations to Baghestani," and "obtain[ing] a declaration from Baghestani for use in this lawsuit." "The intention of [the Earles] in all of this misconduct . . . [was] to serve their own venal financial and other interests in controlling the Property of Orang and Azita, and/or forcing Orange and Azita to sell the Property to them." Further, the Dialamehs allege that Laurie "filed a [restraining order] application against Afsaneh claiming that Afsaneh's behavior frightened her" and then "abused service in order to intimidate Fari and cause her anxiety and distress. Specifically, the sheriff was sent to Fari's unit to serve Afsaneh for appearance in the civil action [Laurie] had filed against her . . . . Thereafter, a process server was sent back to Fari's unit to serve Fari as a witness in the civil harassment action of [Laurie] against Afsaneh. As a result an ambulance had to be called to take Fari to the hospital from the stress. . . . [Laurie's] purpose in acting in this manner was to induce as much stress upon Fari, an elder and dependent adult, as possible and to force her to abandon her rights in the Property."

As we have said, the anti-SLAPP statute's focus is not the form of the plaintiff's cause of action or the defendant's motivation, but rather, the defendants' alleged *acts*. Here, the Dialamehs allege that Fari and Afsaneh were forced from their property because the Earles counseled Baghestani to sue the Dialamehs for charging excess rent, and Baghestani brought such a suit. With the same purpose of forcing Fari and Afsaneh

15

from the property, Laurie and/or Jim are alleged to have served as witness for Baghestani, appeared in court for him, sought a restraining order against Afsaneh, abused service of process, and filed the present action. The second and third causes of action, therefore, allege protected conduct within the meaning of the anti-SLAPP statute.

The Dialamehs urge that cross-defendants have not satisfied prong one because "nowhere" do they "explain the logical nexus between the filing of [Baghestani's] excess rent claim and Fari's moving out[,] which is the proximate cause alleged in the [cross-complaint] of [the Dialamehs' and Fari's] damages." The contention is specious. Whatever its merits, a nexus between Baghestani's excess rent claim and Fari's moving out of Unit A is expressly alleged in the cross-complaint—which, as we have said, asserts that the excess rent case was brought "to stir up antagonism" among the Dialameh family and "procure the eviction of Fari and Afsaneh."

The Dialamehs also assert that the excess rent case is "evidentiary background in this case," *not* the "gravamen or principle thrust of" the second and third causes of action. They contend the gravamen of those causes of action is "unprotected harassment." We do not agree. While the second and third causes of action do allege harassment— "[Baghestani] challenged [Fari and Afsaneh's] right to move around the common areas, to have guests, to make any sound[,] to take out the trash, to use the walkway, and to use the laundry room . . . confronted them, assaulted them, made false charges, called the police and generally harassed them night and day at the direction of and with the encouragement of [the Earles]"—such alleged harassment is not the "gravamen" of the causes of action. Read most favorably to the Dialamehs, the second and third causes of action allege that Fari moved out of Unit A because of discord and antagonism created *both* by the excess rent suit *and* the alleged harassment. As we have said, " 'a plaintiff cannot frustrate the purposes of the SLAPP statute through a pleading tactic of combining allegations of protected and nonprotected activity under the label of one "cause of action." ' " (*Cho v. Chang*, *supra*, 219 Cal.App.4th at p. 527, quoting *Fox Searchlight Pictures, Inc. v. Paladino*, *supra*, 89 Cal.App.4th at p. 308; see also *Comstock v. Aber*

16

(2012) 212 Cal.App.4th 931, 946.)  Accordingly, the second and third causes of action arise from protected conduct within the meaning of the anti-SLAPP statute.

### III.

### The Second Prong:  Probability of Prevailing

Having concluded that the first prong of the anti-SLAPP statute is met because the cross-complaint is based on protected conduct, we move to the second prong— probability of prevailing.[5]  To demonstrate a probability of prevailing, the Dialamehs "must state and substantiate a legally sufficient claim (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1122-1123), thereby demonstrating [their] case has at least minimal merit.  (*Cole v. Patricia A. Meyer & Associates, APC* (2012) 206 Cal.App.4th 1095.)  [¶]  'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." [Citations.]'  (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.)"  (*Finton Construction, Inc. v. Bidna & Keys, APLC* (2015) 238 Cal.App.4th 200, 211.)

"We decide the second step of the anti-SLAPP analysis on consideration of 'the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.'  (§ 425.16, subd. (b).)  Looking at those affidavits, '[w]e do not weigh credibility, nor do we evaluate the weight of the evidence.  Instead, we accept as

---

[5]     The Dialamehs urge that if we find the cross-complaint alleges protected conduct (prong one), we should remand to the trial court to determine probability of success (prong two) in the first instance.  We decline to do so.  Where the trial court does not reach the second prong of an anti-SLAPP motion, the reviewing court "[has] discretion to decide the issue ourselves, since it is subject to independent review."  (*Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1195.)  For reasons of judicial efficiency, we exercise our discretion to consider the issues relevant to the second prong of the anti-SLAPP analysis.

For purposes of this discussion, we sometimes refer to the three cross-complainants (Orang, Azita, and Fari) collectively as "the Dialamehs."

17

true all evidence favorable to the [Dialamehs] and assess the [Earles'] evidence only to determine if it defeats the [Dialamehs'] submission as a matter of law.' (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 699-700.)" (*Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 989.) "As the Supreme Court early-on noted, the anti-SLAPP statute operates like a 'motion for summary judgment in "reverse." ' (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 719.) Or, as that court would later put it, 'Section 425.16 therefore establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation. [Citation.]' [Citations.]" (*Grewal v. Jammu*, *supra*, 191 Cal.App.4th at p. 990.)

### A. *Breach of Fiduciary Duty*

As we have said, the Dialamehs assert that the Earles provided them with legal advice and counsel, and thus owed them fiduciary duties as their lawyers. The Earles agree that attorneys owe their clients fiduciary duties, but they contend that they never had an attorney-client relationship with the Dialamehs.[6] For the reasons that follow, the Earles are correct.

### 1. Applicable Law

"To state the obvious, an attorney's duty to his or her client depends on the existence of an attorney-client relationship. If that relationship does not exist, the fiduciary duty to a client does not arise. (*Shelly v. Hansen* (1966) 244 Cal.App.2d 210, 214, disapproved on different grounds in *Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 190, fn. 29.)" (*Fox v. Pollack* (1986) 181 Cal.App.3d 954, 959 (*Fox*).) Thus, a necessary element of the Dialamehs' breach of fiduciary duty claim is the existence of an attorney-client relationship.

---

[6] " 'The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach. [Citation.] Whether a fiduciary duty exists is generally a question of law. [Citation.]' " (*Green Valley Landowners Assn. v. City of Vallejo* (2015) 241 Cal.App.4th 425, 441.)

In determining whether an attorney-client relationship has been established, "several guiding principles are applicable. 'It is elementary that the *relationship* between a client and his retained (or noncourt-appointed) counsel arises from a contract, whether written or oral, implied or expressed.' (*Purdy v. Pacific Automobile Ins. Co.* (1984) 157 Cal.App.3d 59, 75, original italics.)" (*Gulf Ins. Co. v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone* (2000) 79 Cal.App.4th 114, 126.) An attorney-client relationship can be formed though no retainer is signed or no fees are paid. (*Ibid*.) However, an attorney-client relationship does not arise "whenever issues touching upon legal matters are discussed with an attorney. . . . [A] communication is not privileged, even though it may involve a legal matter, if it has no relation to any professional relationship of the attorney with the client. [Citation.] Moreover, it is not enough that the client seek advice from an attorney; such advice must be sought from the attorney '*in his* [*or her*] *professional capacity*.' ([Evid. Code,] § 951.)" (*People v. Gionis* (1995) 9 Cal.4th 1196, 1210, italics added.)

"California law is settled that a client's subjective belief that an attorney-client relationship exists, standing alone, cannot create such a relationship, or a duty of care owed by the attorney to that plaintiff. (*Fox v. Pollack*, *supra*, 181 Cal.App.3d at p. 959.) This is because a plaintiff cannot unilaterally establish an attorney-client relationship, and its hindsight 'beliefs' that such a relationship existed are thus legally irrelevant. (*Ibid*.) Instead, it is the *intent and conduct* of the parties that controls the question as to whether an attorney-client relationship has been created." (*Zenith Ins. Co. v. Cozen O'Connor* (2007) 148 Cal.App.4th 998, 1010 (*Zenith Ins. Co.*), italics added.)

Because an attorney-client relationship is created by contract, the party asserting the existence of such a relationship must establish the predicate facts necessary to establish such a contract. If a party is asserting that an attorney-client relationship arose from an *implied*, rather than an express, contract, that party must "allege the predicate facts necessary to establish such an implied contract . . . . Specifically, Civil Code section 1621 delineates the requirements for an implied contract: 'An implied contract is one, the existence and terms of which are manifested by conduct.' 'An implied contract

19

" '. . . in no less degree than an express contract, must be founded upon an ascertained agreement of the parties to perform it, the substantial difference between the two being the mere mode of proof by which they are to be respectively established.' " [Citation.] . . . . Although an implied in fact contract may be inferred from the "conduct, situation or mutual relation of the parties, the very heart of this kind of agreement is an *intent* to promise." [Citation.]' [Citations, italics added.]" (*Zenith Ins. Co.*, *supra*, 148 Cal.App.4th at p. 1010.)

Applying these principles, courts have held that the mere assertion of the existence of an attorney-client relationship, without more, is insufficient to support a breach of duty claim. For example, in *Zenith Ins. Co.*, *supra*, 148 Cal.App.4th 998, a reinsurer asserted a professional negligence claim against the lawyer retained by the primary insurer. The reinsurer conceded there was never an express agreement with the lawyer that legal services were to be provided to it, but it asserted that an attorney-client relationship arose by implied agreement because it "gave instructions and direction to" the lawyer regarding the handling of claims, discussed pending litigation and settlement strategy, and was told by the lawyer that a proposed settlement was in its best interests. (*Id*. at p. 1004 & fn. 3.) The reinsurer asserted that as a result of these circumstances, it reasonably relied on the law firm to evaluate, investigate, and prosecute claims to reduce its financial liability. (*Id*. at p. 1004.)

The lawyer demurred, and the trial court sustained the demurrer without leave to amend, concluding that there were not sufficient facts alleged to demonstrate the creation or existence of an attorney-client relationship. (*Zenith Ins. Co.*, *supra*, 148 Cal.App.4th at p. 1005.) The Court of Appeal affirmed. It explained that the allegations of the reinsurer's complaint "provide very little factual specificity as to the number, nature and character of the communications between it and [the law firm] and upon which it seems to base its belief that an attorney-client relationship existed." (*Id*. at p. 1011.) The few specific communications alleged "hardly provide[] any basis whatever for [the reinsurer] to conclude that [the law firm] was acting as its attorney," and "[e]very other allegation . . . is totally general and subjective." (*Ibid*.) Such general, subjective allegations, the

20

court concluded, are "simply not enough. Just as [the reinsurer's] subjective 'belief' that it was [the law firm's] client, and [its] allegation that it 'paid' [the law firm's] bills (because it reimbursed [the primary insurer]), did not create an attorney-client relationship between [the law firm and the reinsurer], it is also true that [the law firm's] communications created no such a relationship." (*Ibid.*)

The court reached a similar conclusion in *Fox, supra*, 181 Cal.App.3d 954. There, the appellants orally agreed to exchange parcels of real property with the Bennetts, who said they would have their attorney, Pollack, prepare the necessary documents. Appellants' only contact with Pollack was at a meeting during which the property exchange agreement was executed. Appellants knew that Pollack was the Bennetts' attorney, and Pollack did not tell them he was acting as their attorney. (*Id.* at p. 958.) However, Pollack did not advise the appellants to seek independent counsel, and when appellants met at Pollack's office, Pollack read the agreement to them out loud, gave them time to review it, asked periodically if they understood its terms, and received their assurances that they did.

After executing the agreement, the appellants sued Pollack, urging that he breached a fiduciary duty to advise them fully about the transaction. (*Fox, supra*, 181 Cal.App.3d at p. 958.) The trial court granted summary judgment for Pollack, and the Court of Appeal affirmed. (*Id.* at p. 957.) It explained: "The affidavits supporting and opposing the motion for summary judgment contain no allegations of evidentiary facts, nor any facts permitting any reasonable inferences from which the existence of an attorney-client relationship between appellants and [Pollack] could be found. Appellants did not hire or retain respondent; they knew he was the Bennetts' attorney; they did not pay him for his services; they did not seek his legal advice; [Pollack] did not render any legal advice to them; and they had no contact with respondent other than the single occasion when they visited his office for the sole purpose of executing the exchange agreement.

"Appellants did allege that they 'thought' [Pollack] was representing their interests because he was an attorney. However, they allege no evidentiary facts from which such a

21

conclusion could reasonably be drawn. Their states of mind, unless reasonably induced by representations or conduct of respondent, are not sufficient to create the attorney-client relationship; they cannot establish it unilaterally. [Citations.] Consequently, as to the causes of action based on breach of a fiduciary duty or other duty arising from an attorney-client relationship, the summary judgment was properly granted." (*Fox*, *supra*, 181 Cal.App.3d at p. 959.)

2. The Dialamehs' Evidence Is Insufficient to State a Prima Facie Case of Breach of Fiduciary Duty

(a) The Dialamehs' evidence

In opposition to the anti-SLAPP motion, the Dialamehs submitted a string of emails between Orang and Laurie that they contend is evidence of an attorney-client relationship between the two couples. Because the emails are central to the Dialamehs' breach of fiduciary duty claim, we quote them at some length:

(1) May 31, 2012 email from Laurie to Dialamehs: "Hi Azita and Orang, [¶] Since today is 5/31, I am assuming today is Afsaneh's last day here before she moves if she hasn't already moved. (She was here Tuesday, 5/29 but not yesterday, 5/30 so she may have moved after 5/29). You told me she is moving to Topanga. She IS moving or has already moved, like you said, right? In any case, I will try to stay out of the walkway or have someone with me if I use it today. [¶] Hope all is well."

(2) May 31, 2012 email from Orang to Laurie: "I'm sorry you and other neighbors are having difficulties with our tenant and inlaw[,] Mrs. Moallef's daughter Afsaneh. First [Baghestani] and per your email below now you have made it abundantly clear that you can't tolerate Afsaneh's behavior. [¶] We have paid Afsaneh to help with her relocation. Afsaneh is telling us she will move the 2nd week of June as that is when she can move in [due] to various reasons. [¶] As for your request to have her moved by 5/31 . . . . [¶] Some background . . . . [¶] Due to the pressure from [Baghestani] we have been asking Afsaneh to move and due to lack of results with her we eventually started asking her elderly and very frail mom to leave the building and offered to address her relocation. As [Baghestani] knows and I'd like you to know as well … her mom has

22

refused and gotten ill as a result of the stress of such requests and along with her attorney have suggested to me that I'm in danger of being abusive to her by asking her to get Afsaneh out.  [¶]  Under these circumstances we continue to convey neighbors['] concerns and complaints as we also must keep seeking to see if we can make Afsaneh to move amicably.  [¶]  Please advise what you think we should do?  [¶]  Do you want me to communicate your desired dates for Afsaneh to move to her or her mom?  [¶]  [O]r should we try our best as we have been to find an amicable way to get her to move?"

(3)  May 31, 2012 email from Laurie to Orang:  "Just to let you know:  My email today was not meant to insist that Afsaneh move by 5/31.  I just assumed it would be by 5/31 because most rentals begin on the first day of the month which would be 6/1.  Mostly, I wanted to know which day she would be moving so I would avoid using our shared walkway alone on the day she moves.  Thank you for telling me Afsaneh will be moving during the second week in June.  I guess that means approximately 6/15.  Again, I would love to know the exact date so that I can avoid accidentally encountering her and having to deal with her screaming or growling insults at me.

"Concerning the background you described:  I hear what you are saying when you say that Afsaneh's mother (your mother-in-law) has become ill as a result of the stress of your request that she move in order to insure that Afsaneh will move.  I am guessing that having Afsaneh screaming at her and at the neighbors, (including now, me) is also causing stress to your mother-in-law.

"This may or may not help you.  What I see going on is the following:  You moved out of the front house and now need your mother-in-law around to provide the key to the short term tenants who rent the front house and one of the apartments on your property.  You also need her around in case something, ([i.e.,] cleaning, repairs, etc.) needs to be done in one of those units.  The problem is [. . .] your mother-in-law has created or facilitated a nuisance here.  Allow me to explain.  I often hear screaming fights between your mother-in-law and Afsaneh and have therefore surmised that it must be difficult for your mother in law to live with Afsaneh, who is volatile, smokes marijuana alone and with various friends, comes and goes late at night and is in a constant state of

23

turmoil. You[r] mother-in-law's solution to the Afsaneh problem is to have Afsaneh move into, or primarily use, that office she enters by way of the camouflaged gate . . . that serves as a second entrance to your mother-in-law's apartment. . . .

"Orang, normally, none of this would normally bother me and I think I have been a good and tolerant neighbor. The problem is that now, since you have moved and are not around to supervise things here, everything has escalated. First it was just the late night marijuana with friends and the screaming between your mother-in-law and Afsaneh. Next it was Afsaneh (again, often late at night), bothering all of us by screaming insults at [Baghestani], running up and down the stairs to his apartment, calling the police, pacing the shared walkway yelling or talking loudly to herself, etc., etc. And now, things have escalated to the point where Afsaneh is growling or screaming insults at me if I accidentally encounter her in our shared walkway. All of this . . . interferes with me, my family, my tenants, and your neighbors at 833 20th Street, (whom I often hear yelling at Afsaneh to shut up). We would all love to be able to quietly enjoy our homes.

"It is unrealistic for your mother-in-law to claim any kind of abuse on your part or that she is ill due to the stress of being asked to move as a result of the ongoing nuisance she has created and/or facilitated. I have often heard your mother-in-law right there in apparent approval when some of this stuff has happened and she is also clearly willing to fabricate stories to assist Afsaneh, all of which I find disturbing. If you wish, you can have your mother-in-law's lawyer call me or Jim to discuss this. Trust me, we will be happy to help you with this. I am confident he will stop '[suggesting that you are] in danger of being abusive to [your mother-in-law] by asking her to get Afsaneh out.'

"In response to some of your questions: As you already know from the past, conveying neighbors['] concerns to your mother-in-law or Afsaneh is not only an exercise in futility but actually makes the problem worse. . . . Obviously, the best thing would be for you to find an amicable way to get Afsaneh and/or her mother to move. No one wants more problems here. If you can't accomplish this amicably, please do what you have to do. Jim and I will help you in any way we can.

24

"I want you to know that if I installed a family member or tenant on my property that caused the kind of problems and stress to you, your family members, your tenants or neighbors that Afsaneh has caused, you would be asking me to get that family member or tenant out of here and I would apologize and immediately do so. I would never force you to deal with this kind of abusive nuisance.

"I am begging you to please help us out here. I am thanking you in advance because I am anticipating your help."

(4) June 4, 2012 email from Laurie to Orang: "Just [to] reiterate, all Jim and I want is to be able to peacefully enjoy our home without having to listen to Afsaneh's screaming, without the police here, without being called names in the shared walkway, without the threat of being falsely accused of something, without being [awakened] with drama, without having to lower the rent on our rentals because of tenants complaining and threatening to move over the chaos. I am sure you can imagine how you and Azita would feel if we moved out of our house with you still next door and left you to deal with some family member of ours who created these kinds of problems for you. Azita has complained in the past about stuff much smaller than this and yet she expects us to accept this chaos. It's not realistic, reasonable, or fair. [¶] Having said all of the above, Jim and I will help you in any way we can with this. Have the lawyer for Afsaneh and her mother call Jim and [me] so that we can explain what they will be up against if they sue you. It will be expensive and they will lose. Let us know if you want our help."

(5) June 5, 2012 email from Orang to Laurie: "In the past several years we have twice demanded and moved Afsaneh out of [Fari's] place but she has come back due to her situation. Last year we asked and offered for [Fari] to move to a comparable place but she refused and we got threats from her and Afsaneh. With your eye witness accounts now this forces us to seek a permanent solution to the situation. [¶] I think the only way to fix this situation is to demand that [Fari] move. I'm concerned that moving Afsaneh out will only be a temporary measure and [the] only permanent solution is to move [Fari]. We will offer her a place to stay but I don't want this problem to be fixed short term only to come back again. [¶] I can use your and Jim's help."

25

In opposition to the anti-SLAPP motions, the Dialamehs submitted Orang's declaration, which characterized his email and other communications with Laurie as follows. In April of 2012, Laurie "started suggesting in a very friendly way to me that I should just find a way to move out Afsaneh." Orang "explained that [Fari and Afsaneh] had a lease agreement with me and unless they would agree willingly I could not move them." "But [Laurie] would not stop her friendly advice to get me to move them." "On May 31, 2012, [Laurie] sent me a long email discussing the facts and evaluating my position for me. She concluded that it would be unrealistic for Fari to claim elder abuse; she said I could have Fari's lawyer call her to discuss it. She said: 'If you wish you can have your mother-in-law's lawyer call me or Jim to discuss this. . . . Obviously the best thing would be for you to find an amicable way to get Afsaneh and her mother to move. No one wants more problems here. If you can't accomplish this amicably please do what you have to do. Jim and I will help you any way we can." Subsequently, "On June 4, [Laurie] wrote reiterating the suggestion that they would speak to the lawyer for Fari and Afsaneh: *Jim and I will help you in any way we can with this. Have the lawyer for Afsaneh and her mother call Jim and I so that we can explain what they will be up against if they sue you. It will be expensive and they will lose. Let us know if you want our help.* On June 5, 2012, I emailed [Laurie] back, discussing what was going on and my impressions and stated in bold: *I can use your and Jim's help*."

Orang asserted that following his June 5 email, "we established an attorney-client relationship – I did consult on behalf of Azita as well, both [Laurie] and [Jim] in their professional capacity as lawyers; seeking and receiving legal advice. . . . We also discussed various aspects of: the Property, the tenancies (including all the material terms of the tenancy of Fari), my family relationships, my disputes with Afsaneh, Fari and Baghestani, my history with Baghestani[, and] many other issues directly relevant to this litigation. During many of those calls, [Jim] was present in the background, and [Laurie] was relaying my comments to him and his to me. I understood that they were both acting as my lawyer, that I was consulting with both of them and that . . . Azita and I were the client[s] of both of them. I did not know if they were going to bill me or if they were

26

doing it because they thought our interests coincided. . . . [¶] I had approximately 20 cell phone to cell phone calls with [Laurie] lasting many hours in which I consulted her for legal advice."

(b)     Analysis

Considered in context, nothing in Orang's declaration or the emails it discusses permits a reasonable inference that an attorney-client relationship existed between the Earles and the Dialamehs. As an initial matter, we note that there is no evidence that either Laurie or Jim ever expressly agreed to represent the Dialamehs. Although Orang says he was "seeking their legal advice in their professional capacity as lawyers," he does not say that he ever asked Laurie or Jim to represent him, or that either one agreed to do so. He also concedes that he never discussed legal fees with the Earles and "did not know if they were going to bill" him.

The Dialamehs would have us infer an implied attorney-client relationship from the fact that Laurie "discuss[ed] the facts and evaluat[ed] [the Dialamehs'] position for [them]" and stated that "[i]t would be unrealistic for Fari to claim elder abuse." In the context of the whole email, an inference of an attorney-client relationship is not reasonable. Laurie's analysis is explicitly based on her percipient observations of the conduct of, and interactions between, Fari and Afsaneh—*not* a professional assessment of relevant legal issues. Similarly, in the context of the entire email, we do not believe that Laurie's offer to "help you in any way we can" can reasonably be read as an offer of legal representation. Laurie nowhere expressly offers to represent the Dialamehs or to provide them with legal advice—instead she asks Orang for *his* help and urges him to "do what you have to do." Laurie's request for help and plea to take action is consistent with a neighbor's request to abate a nuisance, but *inconsistent* with the provision of legal advice or an offer of legal representation.

Orang's remaining assertions regarding the Earles' purported legal representation are too "general and subjective" (*Zenith Ins. Co.*, *supra*, 148 Cal.App.4th at p. 1011) to give rise to an inference of an attorney-client relationship. Orang states that he, Laurie, and Jim "established an attorney-client relationship" and that he "consulted [Laurie]" for

27

"legal advice" "in [her] professional capacity"—but such conclusory statements are not evidence of such a relationship. Similarly vague are Orang's statements that he "consulted [Laurie]" "for legal advice," discussing "various aspects of the Property, the tenancies, my family relationships, my disputes with Afsaneh, Fari, and Baghestani and many other issues directly relevant to this litigation." Without more evidentiary detail, this "loose language" (*Koo v. Rubio's Restaurants, Inc.* (2003) 109 Cal.App.4th 719, 729) does not provide an adequate basis on which to infer the existence of an attorney-client relationship between the Dialamehs and the Earles.

The absence of an attorney-client relationship is fatal to the Dialamehs' breach of fiduciary duty claim, which explicitly is premised on such a relationship. Accordingly, the Dialamehs have failed to establish a probability of prevailing on their breach of fiduciary duty claim.

### B.     Interference With Contract

The second cause of action alleges intentional interference with Fari's lease to Unit A. "To prevail on a cause of action for intentional interference with contractual relations, a plaintiff must plead and prove (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. [Citation.] To establish the claim, the plaintiff need not prove that a defendant acted with the primary purpose of disrupting the contract, but must show the defendant's knowledge that the interference was certain or substantially certain to occur as a result of his or her action. [Citation.]" (*Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1148.)

The Dialamehs alleged that Fari "had a *written lease* respecting Unit A of the Property," that was "also augmented by oral terms." (Italics added.) They did not provide a copy of Fari's written lease in opposition to the anti-SLAPP motions, however. Instead, they submitted Orang's declaration, which said: "Fari first lived at the Property in early 2003 when she came to care for our new born daughter. After living with us in

28

the front house for a short time, Fari signed a lease for Unit A in the amount of $570 per month and she continued to pay rent in that amount until she moved out in September 2012. This lease is subject to the Santa Monica Rent Control Ordinance."

In reply, the Earles and Baghestani asserted that the Dialamehs failed to present evidence of a valid contract (lease) "because there is no contract." In support, they lodged: (1) a certified copy of an Application for Owner-Occupied Fee Waiver[7] submitted by the Dialamehs to the Santa Monica Rent Control Board in July 2010, which declared that *they* had occupied the main house and Unit A since they purchased the property in 1995; and (2) the declaration of Lonnie Guinn, Secretary and Custodian of Records of the Santa Monica Rent Control Board, stating that "the first time after 1995 that a new tenancy in Unit A was registered with the Santa Monica Rent Control Board was September 19, 2012."

The Dialamehs' failure to provide a copy of Fari's lease to Unit A, coupled with their failure to prove the creation or terms of such lease, is fatal to their claim for interference with contract. A lease entered in 2003 that gave Fari the continuing right to live in Unit A nine years later, in 2012, would have been subject to the statute of frauds, Civil Code section 1624. Under that statute, "[a]n agreement for the leasing [of real property] for a longer period than one year" is "invalid," unless it is "in writing and subscribed by the party sought to be charged" or "by the party's agent." (Civ. Code, § 1624, subd. (a)(3).) To be enforceable, therefore, Fari's lease would have to be "*in writing.*"

The Dialamehs failed to present any evidence that Fari had an enforceable, written lease that entitled her to live in Unit A. Evidence Code section 1523 provides that "oral

---

[7] According to a website maintained by the Santa Monica Rent Control Board, the "Rent Control registration fee finances the services provided to administer the Rent Control Law." (<https://www.smgov.net/Registration_Fees_Information.aspx [as of April 18, 2016].) The Board is authorized to grant waivers of the annual registration fee for certain units, including for units occupied by "[p]roperty owners who have at least a 25% interest in the property." <https://www.smgov.net/Fee_and_Surcharge_Waivers. aspx>[as of April 18, 2016].)

testimony is not admissible to prove the content of a writing," unless, inter alia, the proponent does not have possession of a copy of the writing and either the original has been lost or destroyed, the writing was not reasonably procurable by the proponent, or the writing is not closely related to the controlling issues. (Evid. Code, § 1523, subds. (a)-(d); see also *Dart Industries, Inc. v. Commercial Union Ins. Co*. (2002) 28 Cal.4th 1059, 1068-1071.) There is no evidence in the present case of any of these exceptions, and thus to prove that Fari had an enforceable written lease, the Dialamehs had to provide the original (or a copy) of the lease itself. As we have said, they did not do so.

Further, even if oral testimony were admissible to prove the contents of a lease, Orang's declaration would not be sufficient to establish the lease alleged here. All his declaration says is that Fari signed a lease for Unit A in 2003, and that she paid rent of $570 per month until she moved out in September 2012. The declaration does *not* state the term of the lease, and it specifically does not say that the lease was still in effect nearly ten years after it was executed. Further, the Santa Monica Rent Control Board documents are inconsistent with the Dialamehs' contention that Fari had a legally-enforceable lease to Unit A.

Accordingly, because they have not made a prima facie case of the existence of Fari's lease, the Dialamehs have failed to prove a probability of prevailing on their cause of action for interference with that lease.

C.    *Elder Abuse*

The third cause of action alleges financial abuse of an elder—namely, that the Earles and Baghestani deprived Fari of "her personal property interest in a below market leasehold protected by the Santa Monica Rent Control Ordinance." As we have just discussed, the Dialamehs and Fari failed to prove the existence of a enforceable written lease to Unit A. Accordingly, Fari has not shown a probability of prevailing on the third cause of action for elder abuse.

**DISPOSITION**

The order denying the special motions to strike is reversed. The matter is remanded to the trial court with directions to (1) enter an order granting the special motions to strike and dismissing the cross-complaint, and (2) conduct proceedings as appropriate to determine costs and reasonable attorney fees, including attorney fees on appeal, to be awarded to appellants. (See *Paiva v. Nichols* (2008) 168 Cal.App.4th 1007, 1038; *City of Los Angeles v. Animal Defense League* (2006) 135 Cal.App.4th 606, 627-628.)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

ALDRICH, J.

LAVIN, J.

31